A. Irwin **TAYLOR** et al., Plaintiffs,

v.

**LOCAL NO. 7, INTERNATIONAL UNION OF JOURNEYMEN HORSESHOERS OF the UNITED STATES AND CANADA (AFL–CIO), et al., Defendants.**

A. Irwin **TAYLOR** et al., Plaintiffs,

v.

**INTERNATIONAL UNION OF JOURNEYMEN HORSESHOERS OF the UNITED STATES AND CANADA (AFL–CIO), Defendant.**

Civ. A. Nos. 14426, 14524.

United States District Court
D. Maryland.

Oct. 16, 1963.

H. Raymond Cluster, Cook & Cluster, Baltimore, Md., for plaintiffs.

Jacob J. Edelman, Marshall A. Levin, Bernard W. Rubenstein, Baltimore, Md., Robert C. Mayer, Associate Gen. Counsel, AFL-CIO, for defendants.

WINTER, District Judge.

In Civil No. 14426, plaintiffs, a group of horse trainers and owners, some of whom are citizens of the Dominion of Canada, sue, *inter alia*, to enjoin defendants, all of whom are horseshoers at thoroughbred flat race tracks in Maryland and elsewhere, and the local of the union of which defendants are members, and its officers, from engaging in price-fixing and from refusing to shoe certain plaintiffs' horses unless the plaintiffs agreed to use exclusively union horseshoers wherever available when they race their horses in the United States and the Dominion of Canada. Plaintiffs allege that

such actions are in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2, and are instituted pursuant to §§ 4 and 16 of the Clayton Act, 15 U.S.C.A. §§ 15 and 26. Coupled with their claim for injunctive relief, plaintiffs pray, also, for declaratory judgments and money damages. In Civil No. 14524 the International Union with which Local No. 7, one of the defendants in Civil No. 14426, is affiliated, is also sued for the same reasons. The cases were consolidated. A preliminary hearing on plaintiffs' request for a temporary restraining order was held, at which affidavits and testimony were presented. At the conclusion of the hearing, defendants agreed to discontinue their boycott of the plaintiffs pending final adjudication of the case, and no order was entered. The matter was then set for hearing on permanent injunction, evidence taken, and the case briefed, argued and submitted.

· The evidence fairly showed that plaintiffs were trainers, and some were owners, of thoroughbred race horses, and that they race their horses at Pimlico, Bowie, and Laurel flat tracks in Maryland, and elsewhere, including other states and the Dominion of Canada. The individual defendants were all horseshoers and were licensed to perform, and did perform, horseshoeing services at the Maryland tracks and elsewhere. In order to perform horseshoeing services at a Maryland race track, a person must be the holder of a farrier's license issued by the Maryland Racing Commission. In order to obtain such a license for a flat track (but not a harness racing track), other than by a grandfather grant, the applicant must successfully pass an examination testing his skill of performance administered by persons, all of whom are members of defendant, Local No. 7. All farriers at Maryland flat tracks are members of defendant, Local No. 7.

The individual defendants, acting individually and as officers of defendant, Local No. 7, and Local No. 7, fix minimum prices for the performance of horseshoeing services at Maryland flat tracks. A

trainer or owner cannot have his horses shod at a price less than this minimum. Failure to charge the minimum price by a member of Local No. 7 would subject the member to disciplinary action and possible expulsion from the union.

Plaintiffs, A. Irwin Taylor, Carl F. Chapman and William F. Edmiston (hereafter called "Canadian plaintiffs") are all residents of the Dominion of Canada and regularly race horses at various race tracks in Canada and the United States. The Canadian plaintiffs have been requested in Canada, where not all race track farriers are union members, to enter into agreements to employ only farriers who are union members in Canada and elsewhere where they race. The request has been made by persons who are members and representatives of Local No. 20, an affiliate of defendant, International Union of Journeymen Horseshoers of the United States and Canada (AFL-CIO) and a sister local to defendant, Local No. 7. The Canadian plaintiffs have refused to enter into such an agreement. Local No. 20 thereupon requested Local No. 7 to withhold services to the Canadian plaintiffs when the latter raced horses at tracks within the geographical jurisdiction of Local No. 7. After consideration, Local No. 7 acceded to the request and, beginning with the Maryland racing season in the fall of 1962, and continuing until the voluntary lifting of the boycott in this case, the Canadian plaintiffs, except Carl F. Chapman, could not obtain horseshoeing services at Maryland race tracks, except by arranging to have their horses trained and run, at least nominally, under the name of another trainer, against whom Local No. 7 was not conducting a boycott. Mr. Chapman, after initially being refused horseshoeing services, signed the requested agreement, and one of the members of Local No. 7 resumed shoeing Mr. Chapman's horses.

■■ There is little question but that the activities of the defendants, both in price fixing and in conducting a boycott, violate the federal antitrust laws unless the defendants' activities are otherwise

exempt.[1]  Price-fixing has long been held to be *per se* an unreasonable restraint of trade and, therefore, a violation of the Sherman Act, United States v. McKesson & Robbins, 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956); United States v. National Assoc. of Real Estate Boards, 339 U.S. 485, 70 S.Ct. 711, 94 L.Ed. 1007 (1950); and United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Similarly, a refusal to deal and group boycotts violate the Sherman Act, Los Angeles Meat and Provision Drivers v. United States, 371 U.S. 94, 83 S.Ct. 162, 9 L.Ed.2d 150 (1962); Klor's Inc. v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); Northern Pac. R. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); Columbia River Co. v. Hinton, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750 (1942).

Defendants contend that such egregious conduct on their part is exempt from federal antitrust prohibitions.  They point to § 6 of the Clayton Act, 15 U.S.C.A. § 17, which states:

"The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the anti-trust laws."

and § 20 of the Clayton Act, 29 U.S.C.A. § 52, which limits the granting of injunctive relief.[2]  Additionally, defendants invoke the Norris-LaGuardia Act, 29 U.S.C.A. § 101 *et seq.*, which removed from courts of the United States juris-

1.  At the hearing on plaintiffs' request for a temporary restraining order, defendants contended that plaintiffs' activities were not interstate in nature, and that the federal antitrust laws were, therefore, not applicable.  This contention has been abandoned at final hearing.  The federal antitrust laws will, therefore, be treated as applicable.  See Yonkers Raceway v. Standardbred Owners Ass'n., 153 F.Supp. 552 (D.C.S.D.N.Y.1957) as an authority holding that the activities of owners and trainers like those in the instant case constitute interstate commerce.

2.  "No restraining order or injunction shall be granted by any court of the United States, or a judge or the judges thereof, in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right, of the party making the application, for which injury there is no adequate remedy at law, and such property or property right must be described with particularity in the application, which must be in writing and sworn to by the applicant or by his agent or attorney.

"And no such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; or from attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do; or from paying or giving to, or withholding from, any person engaged in such dispute, any strike benefits or other moneys or things of value; or from peaceably assembling in a lawful manner, and for lawful purposes; or from doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto; nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States."

diction to issue restraining orders or temporary or permanent injunctions in cases involving or growing out of a labor dispute, except under certain prescribed conditions. Specifically removed from jurisdiction are the acts set forth in § 4 of the Norris-LaGuardia Act, 29 U.S.C.A. § 104, as follows:

"No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction *in any case involving or growing out of any labor dispute* [3] to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

\*  \*  \*  \*  \*  \*

(h) Agreeing with other persons to do or not to do any of the acts heretofore specified;" (emphasis supplied.)

■ Since the decision in United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941), the law has been settled that the provisions of the Sherman Act, the Clayton Act and the Norris-LaGuardia Act must be considered together in determining the scope of the exemption of union activities from antitrust prohibitions, with the result that activities with regard to which the Norris-LaGuardia Act removes jurisdiction to enjoin are rendered substantively valid under the Sherman Act. To the same effect, see Hunt v. Crumboch, 325 U.S. 821, 65 S.Ct. 1545, 89 L.Ed. 1954 (1945); Allen Bradley Co. v. Union, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945); and Columbia River Co. v. Hinton, *supra*. See also, Los Angeles Meat and Provision Drivers v. United States, *supra*.

■ But the validating effect of the Norris-LaGuardia Act has limits also. Where a union and its members combine with non-labor groups to monopolize a market and to fix prices of a product, such conduct has been held to violate the antitrust laws, United States v. Employing Plasterers Assn., 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618 (1954); United States v. Women's Sportswear Assn., 336 U.S. 460, 69 S.Ct. 714, 93 L.Ed. 805 (1949); and Allen Bradley Co. v. Union, *supra*, and where the activity complained of was, in fact, that of individual businessmen fixing the price of a product, even though denominated that of a union, the antitrust exemption has been held not available to them, Los Angeles Meat and Provision Drivers v. United States, *supra*; Columbia River Co. v. Hinton, *supra*. See also, American Medical Ass'n v. United States, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943).

■ The basic test to determine whether the Clayton and Norris-LaGuardia Acts validate any given activity otherwise condemned by the Sherman Act stems from the language of § 20 of the Clayton Act, 29 U.S.C.A. § 52, and §§ 4 and 7 of the Norris-LaGuardia Act, 29 U.S.C.A. §§ 104 and 107, in the light of the definition of "labor dispute" as contained in § 13(c) of the Norris-LaGuardia Act, 29 U.S.C.A. § 113(c). Consistent with repeated use of the words "employee," "employer," and "employment," the Supreme Court, in Columbia River Co. v. Hinton, *supra*, has said (315 U.S. p. 147, 62 S.Ct. p. 522, 86 L.Ed. p. 754): " \* \* \* the employer-employee relationship was the matrix of the controversy." See also, Hawaiian Tuna Packers v. International L. and W. Union, 72 F.Supp. 562 (D.C.Hawaii 1947). Stated otherwise, if the parties to a dis-

3. § 13(c) of the Norris-LaGuardia Act, 29 U.S.C.A. § 113(c) defines "labor dispute" for the purposes of the Act to mean:
   " \*  \*  \* any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

pute stand in the relationship of employer and employee and dispute some aspect of that relationship, or if the employer-employee relationship of someone else is the crux of the dispute between the parties, activities like those in the case at bar are validated by the Norris-LaGuardia Act.

Applying that test, plaintiffs contend that the individual defendants do not stand in the position of employees in a relationship of employment to the plaintiffs, or those similarly situated, as employers. Hence, they assert price-fixing and boycotting on the part of the defendants does not involve or grow out of any labor dispute, so that such activities are not rendered valid and the Court has jurisdiction to prohibit them. Conversely, the defendants assert that they are employees of the owners and trainers for whom they perform horseshoeing services, that the latter stand in the position of employers, and that § 4 of the Norris-LaGuardia Act, 29 U.S.C.A. § 104, though couched in terms of jurisdiction, fully legitimates any price-fixing or boycotting on their part. Additionally, defendants assert that, even if they are not employees of the trainers for whom they work, the defendants are "person[s] participating or interested in a labor dispute" under § 13(b) of the Norris-LaGuardia Act, 29 U.S.C.A. § 113(b), and that the case involves or grows out of a labor dispute, since it "involves persons who are engaged in the same industry, trade, craft, or occupation," within the meaning of § 13(a) of the Norris-LaGuardia Act, 29 U.S.C.A. § 113(a). This latter argument is predicated on the fact that certain horseshoers, such as those employed by the larger stables and by the tracks, are clearly employees, and the defendants, collectively, assert that they have a direct interest in the condition of such horseshoers, as well as general conditions in the industry.

The starting point in the consideration of whether race track farriers are employees, and trainers and owners employers, is a recitation of the facts disclosed by the evidence. In order to consider the evidence of the present-day relationship, it is helpful to recite some history to show how the advent and growth of motor vehicles has altered the functions of horseshoers.

The defendant International Union was chartered in 1874. It became affiliated with the American Federation of Labor in 1893, and its maximum peak in membership was reached in the period 1915 to 1919, when it had 2,000 to 2,500 members. Its low point in membership was experienced immediately prior to 1940, when there were only three locals affiliated with the International Union. In 1953 total membership was one hundred ninety-five. At the present time twenty-two locals are affiliated with the defendant International Union, sixteen consisting of horseshoers of thoroughbred horses, four horseshoers of harness horses and two general horseshoers, who will shoe any type of horse. The present membership is more than double the membership in 1953.

Originally only those persons who were employees in a public horseshoeing shop were members of the International Union. As the use of the horse for transportation ceased, as illustrated by the shrinkage in the number of locals affiliated with the defendant International Union, the function of the horseshoer was limited to horses kept for pleasure. At this time, which was approximately in the late 1920s, thoroughbred and harness racing were carried on, but the length of meets were considerably shorter than at the present time; for example, racing during the winter season was relatively unknown. But, since the late 1920s, racing seasons have been extended and more race tracks have been established, so that during the early 1940s there was a veritable explosion of new locals, whose members provided shoeing services for race horses. In 1941, twelve or thirteen new locals came into being and affiliated with the International Union. At this time the usual pattern followed was that the horseshoers were employed on a full time salary basis by the large racing stables which maintained a number of horses

and which participated in race meetings on a sectional, if not national, basis. Since that time fewer large stables have been maintained, and in their stead there has arisen the so-called public trainer who, for a fee, will train and race horses of owners who own too few horses to warrant the employment of a trainer whose services are devoted exclusively to their horses. As a result, there are at the present time only fifteen to twenty horseshoers employed by private stables on a full time salary basis—the remainder, insofar as thoroughbred racing is concerned, perform their services on a piecework basis for a public trainer for the account of the owners whose horses he is training and racing.

Services to public trainers are performed exclusively at the race track. At Maryland tracks, in addition to those horseshoers who are present on the track to render services to trainers, two horseshoers are employed by the track on a part time salary basis, to be present at the paddock and the receiving barn to render emergency services to a horse immediately before or after racing. The cost of providing this service is borne exclusively by the management of the track.

Except for the few remaining horseshoers employed by owners or by track management, compensation to a horseshoer is based on piecework. An ordinary shoeing job requires thirty-five to forty minutes to perform. The fee exacted by the horseshoer for shoeing a horse includes the cost of adjusting the shoes during the period following the time that a horse is shod and before a horse requires reshoeing.

Originally, horseshoers manufactured the shoes which they applied to a horse, but in recent years premanufactured aluminum and steel shoes are the order, rather than the exception. The horseshoer purchases the shoes which he will require and includes the cost thereof in the fee which he charges without separately stating the cost of the shoes. In determining the fees to be charged, the members of Local No. 7 include the bare cost of the shoes without any allowance for profit on resale, except if there is need for a special, more expensive, shoe. In that event, the overall charge will be in excess of the standard charge by the amount of the cost of the special shoe over the cost of the standard shoe. Some few owners or trainers furnish their own shoes. In that event, the farrier charges the standard fee, less the cost of regular shoes which he would otherwise provide.

Fees for shoeing horses are generally billed on a monthly basis, but it is not unusual for a horseshoer to be paid his fee immediately upon the completion of a given assignment. Some horseshoers also receive a retainer fee, that is, a fixed charge, in consideration of which they hold themselves available at all times to perform services for the owner or trainer who pays them such fee. When called upon to render services, they charge, in addition, the piecework fees set by the Local to which they belong when the sum of the piecework charges exceeds the amount of the retainer. Except for salaried horseshoers, an owner or trainer makes no deduction from the compensation paid a horseshoer for withholding taxes, workmen's compensation, or Federal Contribution Act taxes. Members of Local No. 7 expect to charge, and be paid, at least the schedule of prices fixed by Local No. 7; there is no negotiation between the horseshoer and the owner or trainer.

Horseshoers perform their services in the stalls where the horse to be shod is customarily kept. At each Maryland race track there is a blacksmith shop which contains the facilities for heating and shaping the shoe, and which serves as a central meeting point for the blacksmiths at the track. Each blacksmith supplies his own tools, and when he has an apprentice he pays the apprentice a weekly sum according to the scale approved by the local union.

When a trainer desires the services of a horseshoer he makes the initial contact at the blacksmith shop. This contact is generally made only at the beginning of the racing meet. In most instances, the same blacksmiths will go from race track

to race track, as the owners and trainers for whom they customarily provide services move their horses, so that it may be fairly said that the relationship, however denominated, between most trainers or owners and most farriers is a continuing one of indefinite duration and not sporadic and occasional.

There was evidence that the trainers do not control the time that a horseshoer works. One testified "He [the farrier] comes when he wants, goes when he wants, does what he wants." In the last analysis, a blacksmith controls his own working time like any other person who enters into a personal service contract, in that, except negatively under certain circumstances, he cannot be made to perform. On the other hand, there is economic pressure on him to work, since a horseshoer works to support himself and his family, and not simply for his own amusement. The record is clear, also, that in deciding when to work, as well as with regard to the quality of his work, a horseshoer is in the position of having to please the owner or trainer if he desires continued engagement, because the owner or trainer who is dissatisfied with the services of a particular farrier can, and does not hesitate, to replace him with someone else. A farrier must also accommodate the needs of a particular trainer or owner with the needs of the other trainers or owners for whom he performs horseshoeing services, as well as to adjust his working time to the time that the horse is being trained, is being fed, and is being raced. Subject to these sometimes conflicting demands, I find that the trainer or owner does have control over the time that a horseshoer works.

To shoe a horse it is necessary that the old shoe be removed, the hoof filed to its proper level and degree of smoothness, the frog (the living part of the hoof) trimmed, a new shoe fitted (sometimes involving a trip to the blacksmith shop for heating and bending of the shoe), the new shoe nailed to the hoof and adjusted to a level, and the protruding portions of any nails filed to the level of the shoe or the shell of the horse's foot.

In the actual performance of these services some of the owners and trainers testified, generally, that they neither exercised any control nor had any right to exercise any control over the farrier. A close analysis of their testimony, and a consideration of the testimony of the farriers, belies this conclusion.

The record is clear that the owner or trainer possesses the right to control and, on many occasions, exercises it. He regularly exercises the right to select the type of shoes which will be placed on a horse. Whether he exercises the right to control the later steps in the shoeing process is a matter of the degree of confidence which an owner or trainer has in the blacksmith who is performing services and perhaps, also, the temperament of the owner or trainer involved. Subject only to dissimilarities of temperament of various owners and trainers, when the owner or trainer has confidence in the farrier, and believes him to be skilled, he exercises little, if any, supervision over the performance of the various steps. On the other hand, if the owner or trainer lacks confidence in the ability of the farrier, he pays considerably more attention to the details of shoeing.

In support of these conclusions, the president of the International Union, who has been a horseshoer for thirty-four years, expressed the position of the farrier by saying, "You try your best to satisfy the employer, many times against your own better judgment, but if it is his orders, you are working for him." He amplified this on cross examination by stating, generally, that the owner or trainer has the same degree of supervision over the farrier as the farrier does over his apprentice. An owner or trainer may, and sometimes does, decide how far the nails shall be driven into the hoof and the area where he wishes to place the nails. An owner or trainer may, and sometimes does, tell the farrier how much to trim from the hoof, even to the extent that he may cause the horse's hoof to bleed. Another farrier testified that the owner or trainer may specify the angle at which the hoof should be trimmed and

may, and occasionally does, check the angle after trimming, before the shoe is applied. A third farrier—whose experience has been mostly at Maryland flat tracks—stated that during the shoeing process some trainers are present during the entire time and "tell you every move to make on shoeing the horse." He stated that some trainers go as far as to check the level of the hoof before the shoe is applied, to give specific instructions as to the length or shortness of the hoof and to instruct that the frog not be touched. One of the trainers, who, on direct examination, had disavowed any control over the horseshoer, admitted on cross examination that if there arose a difference of opinion as to how the horseshoer was performing his work, "I [the trainer] make him see it my way and have it done my way."

On these facts, defendants contend that the approach in National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944), should be followed, and plaintiffs should be held to be employees. In that case it was decided that newsboys who, by common law standards were independent contractors, should be treated as employees for the purposes of the National Labor Relations Act of 1935, because (322 U.S. p. 128, 64 S.Ct. p. 859, 88 L.Ed. p. 1183) "the economic facts of the relation [with the publishers of newspapers]" made it "more nearly one of employment than of independent business enterprise with respect to the ends sought to be accomplished by the legislation." Plaintiffs counter by arguing that the holding in the *Hearst* case was legislatively reversed by enactment of the Taft-Hartley Act of 1947, which amended definition § 2(3) of the National Labor Relations Act, 29 U.S.C.A. § 152(3), and they cite both the legislative history, as disclosed in H.R.Rep. No. 245, 80th Congress, First Session 18 (1947), and those cases which have construed the amendment to alter the holding of the *Hearst* case, United Insurance Company of America v. N. L. R. B., 304 F.2d 86 (7 Cir. 1962); National Van

Lines, Inc. v. N. L. R. B., 273 F.2d 402 (7 Cir. 1960); National Labor Relations Board v. Steinberg, 182 F.2d 850, 854 (5 Cir. 1950); and National Labor Relations Board v. Phoenix Mut. L. Ins. Co., 167 F.2d 983 (7 Cir. 1948). Whether the holding of the *Hearst* case has continued life is problematical, in the light of these authorities, in spite of the contrary indications in Mitchell v. Gibbons, 172 F.2d 970, 973 (8 Cir. 1949), and the citation of the *Hearst* case in Los Angeles Meat and Provision Drivers v. United States, *supra*, in the concurring opinion (371 U.S. p. 107, 83 S.Ct. p. 169, 9 L.Ed.2d p. 159), and in the dissenting opinion (371 U.S. pp. 108–109, 83 S.Ct. pp. 170, 171, 9 L.Ed.2d pp. 160–162). Plaintiffs argue that legislative adoption of the common law test in the Taft-Hartley Act directs the use of the same test here.

In support of the plaintiffs' contentions, it would seem logical that one who is an employee for purposes of the National Labor Relations Act should be an employee for the purposes of the Norris-LaGuardia Act, since there is an absence of any specific definition of an employee in the latter. But, resolution of this issue is unnecessary in the case at bar, since it appears that, even by the common law test, blacksmiths at race tracks are employees of the owners or trainers for whom they provide services.

One of the best statements of the common law test of who is an employee is contained in 1 Restatement Agency 2d (1958 Ed.) § 220, in the definition of the word "servant," a word the Restatement equates with "employee." There, a servant is defined by § 220(1), to be a person " * * * employed to perform services in the affairs of another and who with respect to the physical conduct of the performance of the services is subject to the other's control or right to control." A number of factors are set forth which should be considered in determining whether one is acting for another as a servant or an independent contractor. The element of control is the first such factor mentioned, but others set out more

fully in the margin are also to be considered.[4]

Not only is the fact of the right to control working time and each step of the horseshoeing process established here, there are other facts which indicate the relationship is one of employer-employee. A blacksmith is compensated on a piecework basis, but part of the consideration for his fee is the continuing services he is called upon to render, until it is time for the horse to be reshod. I have already found that temporally the relationship between owner or trainer and blacksmith is of indefinite duration and not occasional or sporadic. I conclude as a matter of law that for purposes of the Norris-LaGuardia Act the farrier is the employee of the owner or trainer for whom he performs horseshoeing services.

The authorities relied on by the plaintiffs for a contrary conclusion are not persuasive. It is recognized that rarely are any two cases alike on their facts, yet the conclusion that the "union fishermen" in Columbia River Co. v. Hinton, supra, and the grease peddlers in Los Angeles Meat and Provision Drivers v. United States, supra, were "little businessmen," i. e., independent contractors, was largely based on the fact that they were sellers of commodities and received their compensation from profit. Farriers here do not sell commodities; they sell only services. True, included in the standard price for horseshoeing is the cost of a standard shoe, not separately stated, but the manner in which the cost of special shoes is handled clearly demonstrates to my mind the correctness of the statement that, with respect to a standard shoe, the farrier charges no more than the actual cost to him, so that he receives fixed piecework compensation for a standard service.

Nor do I find, United States v. Real Estate Boards, supra, which held real estate brokers and agents to be independent contractors, or Ring v. Spina, 148 F.2d 647 (2 Cir. 1945), which held a playwright not an employee of a theatrical producer, to indicate a contrary result, because an analysis of the services rendered by the alleged employee in each of these situations, and the nature of the service, demonstrate an absence of the actual control, or right to control, so clearly present in the case at bar. The only clear-cut decision contrary to the conclusion which I have reached is the decision of the Ontario Labour Relations Board, in International Union of Journeymen Horseshoers, Local No. 20, and Merrill, et al. (May 27, 1963), which held that certain horseshoers, including one who testified at the instant case, who are members of Local No. 20, were not employees of Canadian trainers and owners for whom they perform services. This decision is one by a Canadian administrative agency applying Canadian law and, upon my consideration of American law and American cases, I have concluded that I should not follow it.

---

4. 1 Restatement, Agency 2d (1958 Ed.) § 220(2):
"(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:
(a) the extent of control which, by the agreement, the master may exercise over the details of the work;
(b) whether or not the one employed is engaged in a distinct occupation or business;
(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
(d) the skill required in the particular occupation;
(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
(f) the length of time for which the person is employed;
(g) the method of payment, whether by the time or by the job;
(h) whether or not the work is a part of the regular business of the employer;
(i) whether or not the parties believe they are creating the relation of master and servant; and
(j) whether the principal is or is not in business.

From what has been said, it is unnecessary to consider defendants' second contention.

As ultimate conclusions, I find that I lack jurisdiction to grant injunctive relief, and that plaintiffs are not entitled to the other relief they seek.

Counsel may agree upon a form of order and submit it within ten days.