**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**A. S. ABELL COMPANY and Hearst
Consolidated Publications, Inc.,
Respondents.**

No. 8973.

United States Court of Appeals
Fourth Circuit.

Argued Sept. 27, 1963.

Decided Jan. 16, 1964.

1

**2**

Joseph C. Thackery, Attorney, N. L. R. B. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Melvin Pollack, Attorney, N. L. R. B., on brief), for petitioner.

William D. Macmillan, Sr., Baltimore, Md. (William A. Fisher, Jr., and James P. Garland, Baltimore, Md., on brief), for respondent, A. S. Abell Co.

James J. Doyle, Jr., Baltimore, Md. (Sherbow, Shea & Doyle and Theodore Sherbow, Baltimore, Md., on brief), for respondent, Hearst Consolidated Publications, Inc.

Before SOBELOFF, Chief Judge, BOREMAN, Circuit Judge, and NORTHROP, District Judge.

BOREMAN, Circuit Judge.

The National Labor Relations Board here petitions[1] for the enforcement of its order entered May 24, 1962, against A. S. Abell Company and Hearst Consolidated Publications, Inc., which directed that they cease and desist from certain practices found by the Board to be violative of Section 8(a) (1) of the National Labor Relations Act[2] and that the usual notices be posted. Respondents, Hearst and Abell, are newspaper publishers engaged in the production and distribution of newspapers in and around the City of Baltimore. Hearst publishes an evening and a Sunday newspaper called, respectively, the *News-Post* and the *Sunday American,* while Abell publishes the *Sun,* the *Evening Sun* and the *Sunday Sun.* Both publishers utilize a system of distribution which contemplates several types of retail outlets including newsboys, corner vendors, stores and rural or motor carriers. In their operations both publishers recognize and deal with a number of labor organizations. The present controversy arises out of the publishers' resistance to the efforts of Local 355, International Brotherhood of Team-

---

1. The request for enforcement is made pursuant to Section 10(e) of the National Labor Relations Act, 29 U.S.C.A. § 160 (e) (1958).

2. 29 U.S.C.A. § 158(a) (1) (1958).

sters, Chauffeurs, Warehousemen and Helpers of America, to organize the rural and motor carriers.[3] Beginning in March of 1961, four organizational meetings attended by carriers and representatives of Local 355 were held. Hearst and Abell, taking the position that the carriers were independent contractors rather than employees, interrogated several of the carriers with respect to their union activities, informed some of them that the publishers would not recognize or bargain with a union of carriers and that, if necessary, they were prepared to replace the motor carriers with boys. Upon an unfair labor practice charge filed by one of the carriers, the Board's General Counsel issued a consolidated complaint alleging that both publishers had engaged in unfair labor practices in violation of Section 8(a) (1) of the National Labor Relations Act. After a hearing, the Trial Examiner found that the carriers were employees of the publishers and that Hearst and Abell had violated that section of the Act by (1) interrogating the newspaper carriers concerning their union activities; (2) threatening the carriers with loss of their jobs if they joined the union or selected it as their bargaining representative; and (3) threatening refusal to bargain with Local 355 if it were selected as bargaining representative of the carriers. A three-member panel of the Board, one member dissenting, adopted the findings, conclusions and recommendations of the Trial Examiner.[4]

Hearst and Abell do not assert here that there is insufficient evidence to sustain the Board's finding of unfair labor practices if the carriers were properly determined to be employees. The sole issue before this court is whether there is substantial evidence on the whole record to support the Board's conclusion that the carriers here involved are employees rather than independent contractors. After a careful examination of the

record, including the stipulations of the parties and the findings of the Examiner adopted by the Board, we conclude that the request for enforcement of the Board's order should be refused.

The Trial Examiner, after reviewing factors indicative of both independent contractor and employee status, expressed his conclusion as follows:

"Having given careful consideration to each of the above factors and to the total picture which they develop, I am persuaded, and I find, that the publishers retain the right to direct and control, in substantial measure, the details and means by which the delivery of their newspapers by carriers is effected. The carrier performs the service of final delivery in a geographical area which is determined by the publisher and is not his to sell or transfer, under standards and conditions finally fixed, in each case, by the publisher. Although the method of compensating the carrier is indicative of an independent contractor relationship, the system of cost-and-price determination effectively limits the carrier's control over his earning power. Finally, the almost-at-will terminability of the relationship bears directly upon the right of control which is the essential issue here. On balance, I find that the entrepreneurial aspects of the carrier's work are outweighed by the 'outer control' aspects and that the presumption created by the formal agreement had been rebutted."

██ It is conceded that the Trial Examiner properly construed the applicable law in determining that analysis of the degree of control exercised by the publishers over the manner and means of performance by the carriers furnishes the basic means of discerning whether the carriers are independent contractors or employees. In 1947 Congress amend-

3. The carriers are termed rural carriers by Abell and motor carriers by Hearst. We will refer to them hereinafter only as carriers.

4. The Board's decision and order, issued May 24, 1962, are reported at 137 N.L.R.B. No. 36.

**4** 

ed Section 2(3) of the National Labor Relations Act [5] to make it clear that independent contractors were not within its coverage. Prior to the amendment some confusion had existed in the courts and before the Board as to the proper meaning of the term "employee" as used in the Act. In National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944), the Supreme Court held that common-law distinctions between employees and independent contractors were not controlling under the Act, and that the word employee as used therein should be interpreted broadly to effect the purposes of the Act. It was primarily this decision which led to the 1947 amendment specifically excluding independent contractors from the Act's protection. Although the amendment did not define the terms "employee" and "independent contractor", its legislative history makes it quite clear that Congress intended the word employee to denote a person who works for another for wages or salary under direct supervision, as distinguished from one who undertakes "to do a job for a price, decides how the work will be done, usually hire[s] others to do the work" and depends for his income not upon wages but upon profit.[6]

 Common law tests are to be used to distinguish between the two.

N. L. R. B. v. Lindsay Newspapers, Inc., 315 F.2d 709 (5th Cir. 1963); National Labor Relations Board v. Nu-Car Carriers, 189 F.2d 756 (3d Cir. 1951), cert. denied, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952). As stated in National Labor Relations Board v. Steinberg, 182 F.2d 850, 857 (5th Cir. 1950):

> " * * * The usual test employed for determining the distinction between an independent contractor and an employee is found in the nature and the amount of control reserved by the person for whom the work is done, and the employer-employee relationship exists only where the employer has the right to control and direct the work, not only as to the result to be accomplished by the work, but also as to the manner and means by which that result is accomplished. It is the right and not the exercise of control which is the determining element."

Thus, the critical distinction between an independent contractor and an employee is found in the nature and amount of control reserved by the person for whom the work is done. The test, however, admits much more readily of statement than of application. Resolution of the question must depend largely upon the peculiar facts of each case. Moreover, no single

---

5. 29 U.S.C.A. § 152(3) (1958). The Act now provides that "the term 'employee' shall include any employee * * * but shall not include * * * any individual having the status of an independent contractor * * *."

6. H.R.Rep. No. 245, 80th Cong., 1st sess. 18 (1947), states:

"An 'employee', according to all standard dictionaries, according to the law as the courts have stated it, and according to the understanding of almost everyone, *with the exception of members of the National Labor Relations Board*, means someone who works for another for hire. But in the case of National Labor Relations Board v. Hearst Publications, Inc., * * * the Board expanded the definition of the term 'employee' beyond anything that it ever had included before, and the Supreme Court, relying upon the

theoretic 'expertness' of the Board, upheld the Board * * *. It must be presumed that when Congress passed the Labor Act, it intended words it used to have the meanings that they had when Congress passed the act, *not new meanings* that, 9 years later, the *Labor Board might think up*. In the law, there always has been a difference, and a big difference, between 'employees' and 'independent contractors'. *'Employees' work for wages or salaries under direct supervision. 'Independent contractors' undertake to do a job for a price, decide how the work will be done, usually hire others to do the work, and depend for their income not upon wages, but upon the difference between what they pay for goods, materials and labor and what they receive for the end result, that is, upon profits.* * * *" (Emphasis added.)

factor is controlling and the totality of the circumstances must be considered.

■■ Before proceeding to a consideration of the circumstances present here in the relationship between Hearst and Abell and their carriers, the proper scope of this court's review of a Labor Board decision should be emphasized. Under Section 10 of the Administrative Procedure Act[7] and Section 10(e) of the amended National Labor Relations Act,[8] this court's function when reviewing a decision of the National Labor Relations Board is limited to determining whether there is substantial evidence on the record considered as a whole to support the Board's determination. Thus, this court may not substitute its judgment for that of the Board in a case where the evidence admits of two fairly conflicting conclusions even if it would have decided the issue differently had the matter been before it *de novo*. Site Oil Company of Missouri v. N. L. R. B., 319 F.2d 86 (8th Cir. 1963). This is not to say, however, that our inquiry should go no further than to ascertain whether there is evidence in the record which, in and of itself, tends to support the Board's conclusion. Rather we are obliged to scrutinize the whole record, taking into account whatever fairly detracts from the evidence relied upon by the Board. Performance of this duty was forcefully enjoined upon the Courts of Appeals by the United States Supreme Court in Universal Camera Corp. v. Labor Bd., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). There, the Court, speaking of the changes wrought upon the scope of judicial review of Labor Board decisions by the enactment of the Administrative Procedure Act and the amendment of Section 10(e) of the National Labor Relations Act, stated:

"Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, the new legislation definitively precludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes that courts consider the whole record. * * * " Id. 340 U.S. at 487–488, 71 S.Ct. at 464, 95 L.Ed. 456.

And 340 U.S. at page 490, 71 S.Ct. at page 466, 95 L.Ed. 456, the Court said:

"We conclude, therefore, that the Administrative Procedure Act and the Taft-Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. *Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds.* That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." (Emphasis supplied.)

In N. L. R. B. v. Threads, Incorporated, 308 F.2d 1 (4th Cir. 1962), this court noted and applied the principles enunci-

7. 5 U.S.C.A. § 1009 (1958).

8. 29 U.S.C.A. § 160(e) (1958).

ated in Universal Camera as a guide in reviewing Board decisions.

Upon consideration of the whole record, and mindful of the respect which should be accorded Board decisions, we do not believe that the evidence tending to support the conclusion that the carriers here involved are employees of the publishers is substantial. Although a number of exceptions were filed by Hearst and Abell to the basic evidentiary findings of the Examiner, we need not consider those exceptions since in our view the facts as found demonstrate quite clearly that the carriers are not employees.[9]

As found by the Trial Examiner, the rural or motor carriers were originally used to effect delivery of newspapers to homes in rural and outlying areas between cities and towns. They have survived the transition of much of the area from rural to urban and continue to deliver newspapers in areas surrounding Baltimore.[10] Hearst now has 160 such carriers and Abell has 72. Of these, approximately 50 [11] are combination carriers who deliver both Hearst and Abell papers. The primary task performed for the publishers by the carriers is the delivery and sale of the publisher's newspapers to subscribers and others within defined geographical areas.[12] The essential circumstances surrounding the carrier's relationship with the publisher are

such as to negate the possibility of the publisher exercising a significant amount of control over the performance of that task by the carrier.

■ The formal basis of the relationship between publisher and carrier is a written contract. The carrier contracts of Hearst and Abell are basically the same. In essence they provide that in return for the exclusive privilege of selling the publisher's newspapers within a defined geographical area, the carrier agrees that he will pay monthly, at a specified rate, for the papers shipped to him; that he will endeavor to promote and increase the sale of the publisher's newspapers within his territory; and that he will sell no other Baltimore newspaper. The Hearst contract provides also that the carrier shall maintain a current and accurate list of subscribers to be the property of Hearst and endeavor to find a successor upon his termination. One contract form utilized by Hearst provides that no interpretation of the agreement shall constitute the carrier an employee of Hearst. The Abell contract is terminable by the publisher upon the carrier's failure to render satisfactory service or to meet his financial obligations, and by either party upon ten days' notice. The Hearst contract allows termination by the carrier upon thirty days' notice, while Hearst may terminate without notice. It is apparent that the con-

9. It should be noted that to sustain the Board's conclusion, we would have to find that there is substantial evidence in the record pertaining to the carriers of each publisher, considered separately, to support the determination that the carriers are employees. Since we believe that, even if all of the evidence pertaining to the carriers of both publishers be applied to the carriers of each of them, there is not substantial evidence to support the Board's determination, we generally have not distinguished between the evidence separately referable to Hearst and Abell.

10. Both publishers utilize the services of the Audit Bureau of Circulation, a non-profit organization designed to authenticate circulation figures for presentation to advertisers. The Audit Bureau of Circulation has established three "sales zones"

in the Baltimore area; the "city zone" consisting of the City of Baltimore and its immediate suburbs; the "retail zone", a strip surrounding the city zone; and the "all other zone", the area outside of the retail zone. Most of Abell's carriers deliver within the retail zone, while the greatest number of Hearst carriers are used in the all-other zone.

11. It was stipulated by the parties, and the Trial Examiner found, that there are between 46 and 54 combination carriers.

12. In addition to the delivery of newspapers to regular subscribers, the record indicates that some of the carriers sell newspapers to stores and leave papers in coin-box racks in stores and other places along their routes for sale to the public.

tracts on their face do not create an employment relationship, and although this fact is certainly not controlling it is of some import. See, e. g., Site Oil Company of Missouri v. N. L. R. B., supra; United Insurance Company of America v. N. L. R. B., 304 F.2d 86 (7th Cir. 1962); National Van Lines, Inc. v. N. L. R. B., 273 F.2d 402 (7th Cir. 1960).

The essential business decisions concerning the operation of his route are largely within the discretion of the carrier and, like most independent businessmen, he may either reap the profits or bear the losses which are the consequences of his judgments. Accordingly, the carrier alone determines the number of papers he will receive and, since no returns are accepted, when he orders more than he can sell the resulting loss is his. The risk of loss is also on the carrier if the papers are lost, damaged or destroyed after he receives them. Also within the sole discretion of the carrier is the decision whether or not to extend credit to his customers; and as is the case with respect to over-ordering, the carrier bears the risk of noncollection. The carrier generally decides whether customer solicitation in newly developed areas within his territory will be profitable. He must choose whether to operate his route himself or to employ helpers or substitutes. And if he employs others, he must decide upon the manner and amount of their compensation. All of these decisions, and others, materially affect the amount the carrier earns,[13] which is his profit represented by the difference between the purchase price of the papers plus operating expenses and the sum he collects from his customers. Thus, the carrier's income is dependent upon factors which are without the control of the publisher, such as his success in gaining new customers and at the same time retaining old ones (which may be affected by the public demand for newspapers as well as the carrier's diligence and industry), the soundness of his judgment in extending credit and ordering newspapers, and his economy in automobile maintenance and operation and employment of helpers or substitutes. In view of the significant areas of carrier discretion, which afford the carrier the opportunity to increase his profits through industry, diligence and sound business judgment, while presenting the risk that his profits will be lessened by inefficiency and carelessness, we cannot agree with the Trial Examiner's conclusion that "the system of cost-and-price determination effectively limits the carrier's control of his earning power." It is true that the profit realized by the carrier is not great and the risk undertaken not so large as that borne by many independent contractors, but this is so not because of publisher control but because the business is a small one.

We also believe that the facts found by the Examiner show that the carrier performs the actual physical delivery of newspapers largely uninhibited by publisher control. In the actual delivery of newspapers the carrier is subject to very little supervision. His contacts with the publisher are quite limited. Statements of accounts and routine messages are normally transmitted on forms accompanying the papers. The only direct liaison between publisher and carrier is the roadman, a nonsupervisory employee who performs a variety of functions and devotes only a small percentage of his time to personal dealings with the carriers. In the absence of complaints by the customers, the roadman's contacts with the carriers are few and routine. The Examiner found that months pass without contact between an individual carrier and his roadman. One carrier testified that he saw his roadman only once or twice a year. The fact that the carrier's only direct contact with the publisher is through a roadman whom he may see only a few times a year is indicative of the absence of direct supervision.

Although the publishers exercise a limited amount of control over the delivery process, i. e., the requirement that car-

---

13. The Morning *Sun* carriers receive, in addition, a 30–50 dollars monthly subsidy.

riers deposit papers in delivery tubes and that service to a customer be not discontinued except for nonpayment, it is unquestionable that the carrier largely controls the manner and means by which the papers are delivered. The only current and accurate list of subscribers is in the possession of the carrier. The publisher can determine only in a general way from its files the location of any particular customer. As previously stated, the carrier alone decides whether he will use helpers and their selection is entirely within his discretion. The publisher has no opportunity to pass upon the qualifications of those chosen. Indeed, carriers using helpers or substitutes need not even notify the publishers of that fact. The Examiner found that "many carriers, on many occasions—some on a more or less regular basis—have used helpers or substitutes." Some of the carriers have chosen to operate their routes as family affairs with the spouse and children participating in the delivery of newspapers. Some carriers operating contiguous routes cooperate with each other by delivering the other's papers where convenient, and no publisher approval is sought for this practice. Certainly by whom the papers are delivered is an important element of the means by which the job is performed.

Also of some significance is the fact that the carrier determines in large measure the time he will devote to his job. The Examiner found that the publishers insist upon delivery within a reasonable time but it is conceded that there is no fixed time at which the carrier is required to begin or end work and no predetermined number of hours he must devote to delivery. The number of hours the carrier works may depend upon such factors as the size of his route, his efficiency, his mode of transportation, and whether he uses helpers or delivers all of the papers himself. By the same token, since no vacations are provided, the carrier decides when and if he will take time off and makes the necessary arrangements to have the newspapers delivered during his absence.

The carrier provides his own method of transportation. Due to the size of the route and the number of newspapers involved, an automobile is necessary. In each instance, the automobile is furnished by the carrier and, except for a mileage allowance,[14] the carrier bears the cost of its maintenance and operation. The vehicle used by the carrier may be of any make or model and it bears no legend or markings identifying it with either publisher. Although the publisher checks on the carrier's liability insurance prior to entering into the contract, no insurance rider in publisher's favor is required and there is no continuing requirement that insurance be maintained.

An integral and essential part of the carrier's job is collecting from his customers. In the performance of that task he is subject to no control or supervision by the publisher. The publisher makes available monthly bills and collection cards but the carrier is free to use or not use them. As with delivery, the carrier may collect personally or he may use one or more helpers to collect for him. He devises and maintains his own system of record keeping.

The substantial opportunity available to the carrier for the exercise of business discretion and the very large measure of control retained by him over the manner and means by which the delivery of and collection for the newspapers is accomplished are controlling circumstances clearly inconsistent with the conclusion that the carrier is an employee.

In addition to the foregoing circumstances, there are several other factors deserving of mention which strongly indicate that the carriers are independent contractors rather than employees. As

14. The allowance is 9½ cents per mile. The Hearst carriers receive an extra day's allowance per week to defray the expenses of collecting. There is testimony in the record that when a new area is developed within his territory, the carrier will not service it unless a satisfactory mileage allowance is agreed upon in advance.

found by the Examiner, the carriers generally regard themselves as independent contractors. One carrier characterized his job as follows: "Like a store, sir, I buy and I sell." Thus, the carriers pay self-employment taxes and list themselves as self-employed on income tax returns. Some of the carriers make payroll deductions from the wages of their helpers.

It is also apparent that the publishers regard the carriers as independent contractors. Accordingly, those benefits normally afforded their *employees*, such as sick benefits, vacations, pensions and insurance, are not extended to the carriers. The publishers make no deductions for social security or income taxes. They do not carry workmen's compensation insurance on the carriers. Although separate contests are held for them, the carriers are not eligible to enter contests open to employees.

The carriers are free to hold other jobs and several, in fact, are engaged in full or part time employment in addition to their undertakings as carriers. Finally, they are required to deposit with the publishers a cash bond roughly equivalent to the cost of their papers for nine weeks to assure payment of their monthly bills.

The picture developed by these circumstances is unmistakably that of independent contractors and not of employees. The factors which the Trial Examiner felt controlling in reaching the conclusion that the carriers are employees within the meaning of the Act are not clearly discernible from his reported findings. The circumstances relied upon by the Board in its brief as demonstrating control by the publishers over the performance of the work by the carriers relate almost entirely to the result sought to be accomplished rather than the manner or means of its accomplishment. For example, the Board emphasized that the geographical boundaries of the carriers' routes are determined by the publisher. This determination is merely a definition of the job territory and not a restriction upon the manner or means of performance of the undertaking. In fact, the Examiner found that some carriers ignore the boundaries where it is convenient to do so. The Board also emphasized the facts that the publishers prohibit the delivery of advertisements, handbills and other publications with the newspapers and require that the Sunday supplements be delivered on Sunday. These requirements are directly related to customer desires and are certainly concerned with the end result rather than the manner or means of its accomplishment. Of a like nature are the requirements that delivery be made within a reasonable time and that customers be continued except for nonpayment.

The Board also points to one instance when a carrier was "told" to change the place of delivery and to one instance when a carrier was informed that a particular helper was not performing satisfactorily. These incidents, too, may be properly characterized as relating to the end result. In any event, they are isolated instances which are in no way indicative of the real relationship between the publishers and their carriers. Concededly there are certain circumstances, such as the relatively permanent nature of the relationship and the manner in which it may be terminated, which are more characteristic of the employment relationship than of independent contractor status. However, it is the total situation and not any single factor which must determine the status of these carriers. Upon consideration of the whole record, in view of the risks undertaken, the opportunity for profit and the very significant amount of control retained by the carriers over the manner and means by which their routes are operated, we cannot conclude that the evidence indicative of employment status is substantial.

The principal authority relied upon by the Board in support of its conclusion that the carriers are employees is the Fifth Circuit decision in N. L. R. B. v. Lindsay Newspapers, Inc., 315 F.2d 709 (1963). In that case, the Board had determined that certain motor carriers of

Lindsay Newspapers were employees of the publisher and had ordered the reinstatement of two carriers discharged for union activities. The court, in granting enforcement of the Board's order, emphasized seventeen "points" found by the Board as supporting its conclusion that the carriers were employees. Although some of the factors relied upon in that case are present here with respect to either the Hearst or Abell carriers, several significant indicia of the employment relationship which were present in the Lindsay case are absent in this case. Thus, the following circumstances not present here were emphasized in Lindsay:

(1) The publisher required that newspapers be waxed under certain weather conditions;

(2) It required newspapers to be folded in a certain manner;

(3) It accepted returns;

(4) It replaced a certain number of newspapers lost in delivery;

(5) It refused to allow the carrier to bill the subscriber as he saw fit;

(6) The publisher required the carrier to make payment by depositing the amount due it directly into its bank account;

(7) It retained payments made by subscribers for more than three months, thus depriving the carrier of the use of the money;

(8) It insisted upon passing on the qualifications of helpers and substitutes;

(9) It required a carrier to discharge a helper unsatisfactory to it despite the fact that the carrier did not wish to do so;

(10) It prohibited its carriers from holding other jobs.

Thus, at least ten of the seventeen factors relied upon in the Lindsay case are not present here. More significant than the *number* of differences, however, in distinguishing that case from the instant one, is the *nature* of those differences. For example, in Lindsay the publisher's acceptance of returns and replacement of newspapers lost in delivery materially reduced the risk of loss to the carrier. Its insistence on passing upon the qualifications of helpers, together with its restrictions on the method of billing subscribers, indicated the exercise of a substantial amount of control over the manner and means of performance. And, the publisher's requirements that newspapers be folded in a particular manner and waxed under certain weather conditions suggest a much more direct supervision than is present here.

Although, as previously indicated, precedent is of limited value in the resolution of this question, we think much more apposite than the Lindsay case are the following cases which have denied enforcement of Board orders: Site Oil Company of Missouri v. N. L. R. B., 319 F.2d 86 (8th Cir. 1963); United Insurance Company of America v. N. L. R. B., 304 F.2d 86 (7th Cir. 1962); National Van Lines, Inc. v. N. L. R. B., 273 F.2d 402 (7th Cir. 1960); National Labor Relations Board v. Steinberg, 182 F.2d 850 (5th Cir. 1950). Also pertinent to the inquiry here are Schroepfer v. A. S. Abell Co., 48 F.Supp. 88 (D.C.D.Md. 1942), and Hearst Publications v. National L. Relations Board, 136 F.2d 608 (9th Cir. 1943), which was reversed by the Supreme Court before the 1947 amendment to the National Labor Relations Act.

For the reasons above stated, we conclude upon consideration of the record as a whole that the Board's decision is not supported by substantial evidence. The petition for enforcement of the Board's order is therefore denied.

Enforcement denied.