### HINTON et al. v. COLUMBIA RIVER PACKERS ASS'N, Inc.
### No. 9456.

Circuit Court of Appeals, Ninth Circuit.
March 29, 1941.

Ben Anderson, of Portland, Or., for appellants.

Jay Bowerman and C. W. Pecore, both of Portland, Or., for appellee.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

HANEY, Circuit Judge.

Appellee was successful in its suit brought under the anti-trust laws to obtain a decree enjoining appellants from interfering with appellee in its purchase of fish and other marine products and adjudicating that all contracts entered into between the Pacific Coast Fishermen's Union and processors and dealers, whereby the latter agreed not to purchase such products from persons not members of such union, to be void.

The Pacific Coast Fishermen's Union, hereafter called the union, is an organization of persons engaged in fishing, and is chartered by the International Fishermen and Allied Workers of America and the Congress for Industrial Organizations. The union is also a member of the Maritime Federation of the Pacific which is a federation of labor organizations of the Pacific Coast including the International Longshoremen and Warehousemen's Union, the Alaska Fishermen's Union, the United Fishermen's Union, the Cannery Workers Union, the Marine, Cooks and Stewards Union, the Ships Radio Operators Union and other organizations.

The union issues charters to various local unions in various ports of the States of Oregon and Washington, and the contracts hereinafter referred to are entered into between the packers of and dealers in fish and the union or such locals.

The packers of and dealers in fish belong to an organization called the Commercial Fisheries Association. Such Association has throughout its existence bargained with the union, and has been the collective bargaining agency for the packers and dealers. The union and the Association reach an agreement as to the terms of the contracts to be entered into between it or the locals and the packers of and dealers in fish.

It has been and is the practice of the packers of and dealers in fish to purchase fish and other marine products of the Pacific Ocean and its tributaries from various fishermen who are independent contractors. About 90 per cent of the fishermen belong to the union. We may assume that the union has an effective monopoly on the supply of fish caught, and that interstate or foreign commerce is affected thereby, so that the facts regarding these matters need not be stated. Of course there is nothing to prevent operation of their own fishing fleets by the packers.

The union had procured contracts with the packers and dealers for the 1936, 1937 and 1938 seasons which contained the provision: "That it is further understood by all parties herein that the union members shall not be required to work with and/or alongside non-Union employees."

It is conceded that such provision prohibited the packers and dealers from purchasing from any one but members of the union.

The navigable waters of the Umpqua River and its tributary Smith River are principal sources of supply of shad. The shad is available there for about 60 days

each year beginning in April. Under the laws of Oregon the season for commercial fishing opened on April 20, 1939. Fishermen captured fish and sold them to appellee from that date until April 29, 1939. Appellee withdrew from the Commercial Fisheries Association, and declined to enter into a contract with the union on the ground that its execution thereof would violate the anti-trust laws of the United States. The union, thereupon, by threats, intimidation and coercion induced the fishermen not to sell fish to appellee, and prevented appellee from buying any fish caught in the waters mentioned until May 4, 1939, when the court below issued a temporary restraining order against appellants. Appellee was damaged in the amount of $600 by the refusal to sell and deliver fish to it for the period from April 29, 1939, until May 4, 1939.

The court below held that the contracts entered into were void because in restraint of trade, that appellants entered into a plan, scheme and conspiracy in restraint of trade. It enjoined appellants interfering with appellee in the purchase of fish. This appeal followed.

Appellants contend that the injunction is prohibited by the Norris-La Guardia Act, §§ 1–15, 29 U.S.C.A. §§ 101–115, because of the failure to comply with the procedural prerequisites stated in the act. Appellee makes no argument in reply to this contention.

Section 7 of that act, 29 U.S.C.A. § 107, provides in part: "No court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, as herein defined, except after * * * findings of fact by the court, to the effect—* * *."

Five matters are mentioned in the statute. The court below did not make findings as to one or more of them. If this is a "case involving or growing out of a labor dispute" as defined in the act, then the court below lacked jurisdiction to issue the injunction.

The particular words of section 7 which are in controversy are "in any case involving or growing out of a labor dispute, as herein defined". The definitions are given in § 13 of the act, 29 U.S.C.A. § 113, as follows:

"When used in this chapter, and for the purposes of this chapter—

"(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a 'labor dispute' (as hereinafter defined) of 'persons participating or interested' therein (as hereinafter defined).

"(b) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation.

"(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee. * * *"

■ There are two constructions which might be given to § 13. One is that subdivisions (b) and (c) are applicable to the whole of subdivision (a). The other is that subdivisions (b) and (c) are applicable only to the last clause of subdivision (a). Lacking the legislative history of the act, we think we should not decide which construction is correct unless necessary.

The trial court's holding is that there was no "labor dispute" because "terms or conditions of employment" were not involved. We believe the trial court too narrowly construed the act.

The fact that the members of the union were not, strictly speaking, "employees" of appellee or other packers and dealers does not preclude the holding that a labor dispute existed. Lauf v. E. G. Shinner & Co., 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872; New Negro Alliance v. Grocery Co., 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012; § 13(c) of the act. It must be conceded that there was a "controversy". Therefore if such controversy was "concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment," then there was a "labor dispute" as defined by § 13(c) of the act.

New Negro Alliance v. Grocery Co., supra, is distinguishable on its facts. There the controversy was over the race of the people whom the company might or did employ. Here, no such controversy was present, because appellee did not "employ" persons as that word is used in the strict sense. We believe that Milk Wagon Drivers' Union v. Lake Valley Farm Products, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. ——, is controlling and compels the conclusion that a "labor dispute" in fact existed. There, as here, the controversy was between what we call "employers" on one side, and independent contractors on the other side. There are minor distinctions between the two cases ·such as the fact that the independent contractors buy from the employers in one, whereas here they sell to the employers, but we believe they are insufficient to change the rule announced in the Lake Valley case.

Independently of that case, however, we think the act in question is applicable. In construing the words "terms or conditions of employment" the trial court apparently limited them to mean the ordinary case where one person hired out to another for a stipulated wage or salary. We think such a narrow construction is not justified. The words "terms or conditions" need no further explanation. It is obvious that the controversy over the·question as to whether appellee should purchase fish from members of the union only, was a "term" or "condition". The word "employment" is defined in Webster's New Int. Dict., 2d Ed., p. 839 as follows:

"1. Act of employing, or state of being employed; as to seek employment.

"2. That which engages or occupies; that which consumes time or attention; also, an occupation, profession, or trade; service; as agricultural employments."

It can be seen that if the word "employment" is used in several ·of the senses above mentioned, it is broad enough to cover the situation disclosed here. "The words of a statute are to be read in their natural and ordinary sense, giving them a meaning to their full extent and capacity, unless some strong reason to the contrary appears". Miller v. Roberson, 266 U.S. 243, 250, 45 S.Ct. 73, 76, 69 L.Ed. 265. See, also, Old Colony Co. v. Com'r, 301 U. S. 379, 383, 57 S.Ct. 813, 81 L.Ed. 1169. We are unable to find any indication that Congress gave the word a restricted meaning. ·

The above holding obviates decision of other points presented. The injunction, we think, was granted without jurisdiction to do so, and the portion of the decree granting an injunction must be stricken. We remand the cause to the court below for further consideration regarding the remainder of the decree, to determine whether the bill should be dismissed in view of United v. Hutcheson, et al., 61 S.Ct. 463, 85 L.Ed. ——, February 3, 1941, or whether parts of it may stand.

Reversed and remanded, with directions to take further proceedings in accordance with the views herein expressed.