384

The **AETNA FREIGHT LINES, Inc.,**
Plaintiff-Appellee,

v.

·Stanley **CLAYTON,** Individually and as President of Freight Drivers, Helpers and Dockmen, Local Union #375, of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A. F. L., Defendants-Appellants.

**No. 43, Docket 23630.**

United States Court of Appeals
Second Circuit.

Argued Nov. 9, 1955.

Decided Dec. 13, 1955.

Richard Lipsitz, Buffalo, N. Y. (Morris Lipsitz, Buffalo, N. Y., on the brief), for defendants-appellants.

Edward D. Flaherty, Buffalo, N. Y. (Hugh S. Jenkins, Columbus, Ohio, on the brief), for plaintiff-appellee.

Before CLARK, Chief Judge, and LUMBARD and WATERMAN, Circuit Judges.

CLARK, Chief Judge.

This is an appeal from a preliminary injunction restraining defendant representatives of a local union from carrying on certain picketing activities directed at the plaintiff. Plaintiff is an Ohio corporation doing business as an interstate common carrer of iron and steel products. Its principal place of business is in Warren, Ohio; but it maintains a terminal and dispatching point at Buffalo, New York. In order to carry on its business, plaintiff enters into lease agreements with approximately 300 individuals who own and operate motor transportation equipment. These operators receive a stated percentage of the gross revenue which plaintiff has obtained for the transportation of the materials carried. The operators are free to accept or refuse designated shipments; they must bear the cost of operation of their equipment, including gasoline, oil, equipment maintenance, taxes, licenses, insurance (except liability insurance), and other incidental expenses. The lease agreements further provide that, if the owner-driver is absent, substitute drivers are to be paid by the owner-driver, with the latter carrying out the duties of an employer in respect to workmen's compensation, unemployment compensation, social security taxes, and withholding taxes. While vehicles are being operated pursuant to lease agreements, plaintiff has their exclusive use and control. All vehicle drivers must be qualified by plaintiff; and plaintiff, pursuant to I. C. C. rules, carries liability insurance covering all the vehicles. The vehicles carry the name of Aetna Freight Lines, Inc., as well as that of the owner. Plaintiff also hires a relatively small number of persons, who are admittedly employees, to perform supervisory, administrative, and other tasks.

Defendant union is the collective bargaining representative of some employees of trucking firms operating in the Buffalo area in competition with plaintiff. Judge Knight found that in July, 1954, the Union through its agent Clayton demanded that plaintiff enter into a collec-

tive bargaining agreement with it as representative of the owner-operators of transportation equipment. The contention of the Union was that it demanded merely that plaintiff conform to the economic provisions of the contract, which were imposed on its competitors by virtue of their similar agreements with the Union. Although we accept the finding of the court below with respect to this point, it does not affect the result. Among the demands made by the Union was one that Aetna vehicles take on a "city man," a member of Local 375, to help with loading and unloading and other duties in the local area. Judge Knight found that compliance with the Union's demands would violate plaintiff's leases with the individual owner-operators of motor equipment.

After plaintiff had failed to grant its demands, the Union placed a picket at Aetna's terminal and dispatching place in Buffalo, who carried signs on which was printed, "Aetna Freight Lines is unfair to Local #375." The Union also picketed the entrance of Bethlehem Steel Corporation, Lackawanna, New York, and General Drop Forge Company, Buffalo, New York, at times when plaintiff's vehicles were loading and unloading at these locations. It was found that, as a result of the picketing, plaintiff was prevented from rendering service as required under its certificate with the Interstate Commerce Commission, that plaintiff's trade and commerce was injured and impaired, causing irreparable damage in excess of $3,000, and that, since defendants were financially irresponsible, there was no adequate remedy at law. The court therefore granted a temporary restraining order against the picketing on November 10, 1954, and a preliminary injunction followed on December 10. It decided (1) that the individual owner-operators were independent contractors, and not employees of the plaintiff; and (2) that it was therefore "academic" and "unnecessary" to determine whether or not a labor dispute existed. We cannot agree with this analysis.

The Norris-LaGuardia Act, 29 U.S.C. §§ 101–115, removes from the courts of the United States jurisdiction to issue injunctions in cases involving or growing out of labor disputes except in strict conformity with the provisions of the Act. Since it is not contended that the provisions of the Act have been followed in this case, the district court lacked jurisdiction if this is a case "involving or growing out of a labor dispute." Paragraphs (a), (b), and (c) of § 13 of the Act, 29 U.S.C. § 113(a), (b), and (c), define "labor dispute" in a broad and complex manner. Paragraph (a) lists a number of situations which "involve or * * * grow out of a labor dispute"; paragraph (b) defines a person "participating or interested in a labor dispute"; and paragraph (c) defines the term "labor dispute." These paragraphs, treated as a whole, are controlling of the question here presented.

This controversy falls into a number of the categories listed in paragraph (a) of § 13. First, it "involves persons who are engaged in the same industry * * *"; second, it involves persons who "have direct or indirect interests therein"; and third, it "involves any conflicting or competing interests in a 'labor dispute' (as defined in this section) of 'persons participating or interested' therein (as defined in this section)." The definition in paragraph (b) of "person or association * * * participating or interested in a labor dispute" is clearly broad enough to cover the present case, provided a "labor dispute" is found. And in paragraph (c), the definition of labor dispute includes not only "any controversy concerning terms or conditions of employment," but also any controversy "concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or *seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.*" [Emphasis added.]

The Union in this case was attempting to enforce uniform terms and conditions

of employment throughout the Buffalo area for drivers and helpers in the steel hauling business. The Union believed that Aetna's conduct of its business was a threat to the position of the Union throughout the area. Neither the fact that persons working for Aetna may be independent contractors nor the fact that Aetna's dispute was with an organization of persons not its employees would be sufficient to remove this controversy from the broad definition of § 13. There was testimony that defendant union had made agreements both with steel haulers whose drivers were admittedly employees and with companies who operated through the use of lease agreements. Whatever the arrangements of the companies with their drivers, the efforts of the Union to secure more uniform observance throughout the industry of the working conditions enjoyed by its members was a labor matter; and this controversy arising directly from such effort was a "labor dispute" within the meaning of the Act.

The application of the Act to disputes between employers and persons or organizations not their employees has been often upheld. Section 13(c) of the Act has been held applicable to a dispute in which a union picketed an employer to make him require his employees to join the union. Lauf v. E. G. Shinner & Co., 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872. Similarly, where an association of colored persons picketed an employer to induce him to hire Negroes, there was a "labor dispute." New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 304 U.S. 542, 58 S.Ct. 703, 82 L.Ed. 1012. In Milk Wagon Drivers' Union, Local No. 753, etc. v. Lake Valley Farm Products, Inc., 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63, the defendant was a union of milk wagon drivers of certain dairies. Competing dairies used the "vendor" system whereby peddlers who owned their own trucks bought milk from the dairies wholesale and resold it to retail stores. Competition from these "vendors" was a threat to the working standards of the defendant union, and it picketed the stores to which deliveries were made. In that case, if the "vendors" joined the union, they would presumably have ceased to operate as "vendors" and would have assumed a clear employee status. Nonetheless, the Court concluded, per Mr. Justice Black, 311 U.S. 91, 99, 61 S.Ct. 122, 126: "To say, as the Circuit Court of Appeals did, that the conflict here is not a good faith labor issue, and that therefore there is no 'labor dispute,' is to ignore the statutory definition of the term; to say, further, that the conditioned abandonment of the vendor system, under the circumstances, was an issue unrelated to labor's efforts to improve working conditions, is to shut one's eyes to the everyday elements of industrial strife."

It is true that in the Milk Wagon Drivers' case there was evidence that the actual status of the "vendors" was in some respects that of employees, and the "vendors" were members of another union, one of the plaintiffs in the case. Nevertheless, the decision does not turn upon any narrow finding of the status of the operators involved; rather it rests upon the reality of a dispute affecting working conditions in the industry, whether applicable to workers described as "vendors" or as "employees." The principle of the Milk Wagon Drivers' case is broad enough to control this case, and hence the district court was without jurisdiction to issue an injunction. See also United States v. Hutcheson, 312 U.S. 219, 234, 61 S.Ct. 463, 85 L.Ed. 788; Donnelly Garment Co. v. Dubinsky, 8 Cir., 154 F.2d 38; Amazon Cotton Mill Co. v. Textile Workers Union of America, 4 Cir., 167 F.2d 183; Mitchell v. Gibbons, 8 Cir., 172 F.2d 970; Notes, 26 Corn.L.Q. 328; 39 Mich.L.Rev. 663.

▮ In addition to the bar provided by the Norris-LaGuardia Act, the district court was without jurisdiction because plaintiff's exclusive remedy is before the National Labor Relations Board. Here the plaintiff had made no complaint to, or request for relief of, the Board.

The district court found that the conduct of the defendants did not violate the National Labor Relations Act of 1935, as amended, 29 U.S.C. § 151 et seq. We find it unnecessary to pass upon the correctness of this finding, beyond saying that the complaint did allege facts which the Labor Board might reasonably hold to constitute unfair labor practices. The picketing at Bethlehem Steel and at General Drop Forge may easily constitute violations of § 8(b) (4) (A) of the Act, and the picketing at plaintiff's own premises may be violative of § 8(b) (2) —see Pocahontas Terminal Corp. v. Portland Bldg. & Const. Trade Council, D.C.Me., 93 F.Supp. 217—or of § 8(b) (4): The demand for the hiring of "city men" may conceivably present a case of a § 8(b) (6) violation. But whether or not those acts constitute unfair labor practices is for the Board to determine.

■ . Whenever, in a dispute affecting interstate commerce, peaceful picketing which is reasonably cognizable as an unfair labor practice under the Act is alleged, the comprehensive remedy provided by Congress is exclusive, and injunctive relief outside the Act is barred. Garner v. Teamsters, Chauffeurs and Helpers Local Union No. 776 (A. F. L.), 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228; Weber v. Anheuser-Busch, Inc., 348 U.S. 468, 75 S.Ct. 480; Amalgamated Clothing Workers of America v. Richman Bros. Co., 348 U.S. 511, 75 S.Ct. 452; Mitchell v. Gibbons, supra, 8 Cir., 172 F.2d 970.

In the Garner case the Supreme Court found it unnecessary and inappropriate to decide whether or not an unfair labor practice had in fact been committed, but left that determination to the Labor Board. It was enough that the Board could entertain plaintiff's grievance and undertake appropriate action. Further, in the Garner case, which, like this case, involved peaceful stranger picketing, the Court (after discussing possible Board action if an unfair practice were found)

said, 346 U.S. 485, 499, 74 S.Ct. 161, 170:

"Or if it [the Board] found no violation, it would dismiss the complaint, *thereby sanctioning the picketing.* * * *

"The detailed prescription of a procedure for restraint of specified types of picketing would seem to imply that other picketing is to be free of other methods and sources of restraint. For the policy of the National Labor Management Relations Act is not to condemn all picketing but only that ascertained by its prescribed processes to fall within its prohibitions. Otherwise, it is implicit in the Act that the public interest is served by freedom of labor to use the weapon of picketing." [Emphasis added.]

■ Peaceful stranger picketing by a labor organization in the course of a labor dispute is therefore an activity subject to injunction only through the procedures authorized in the Act, and, if not so condemned, is protected by Congress against injunctive prohibition arising outside the Act. The legislative history of the Act indicates that such a pre-emption was intended by Congress. Commenting on the Conference Report resolving differences in the House and Senate versions of the Taft-Hartley bill, Senator Taft said:

"The conferees rejected the broad prohibition of all kinds of strikes. They rejected the repeal of the Norris-La-Guardia Act. The provisions regarding injunctions are exactly those which were in the Senate bill, and were approved by the Senate. The only strikes which are declared to be illegal are secondary boycotts and jurisdictional strikes. In such cases the injunction can be obtained only through the National Labor Relations Board. In that respect the House accepted entirely the provisions of the Senate bill." 93 Cong.Rec. 6445–6446. See also Brody, Federal Pre-emption Comes of Age in Labor Relations, 5 Labor L.J. 743, 759.

■ This case does not involve violence or intimidation. See United Const.

Workers, Affiliated with United Mine Workers of America v. Laburnum Const. Corp., 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025, noted in 68 Harv.L.Rev. 143 (a case also obviously distinguishable because no injunctive relief was sought there). Nor is there a question of "quickie" strikes or other exceptional and objectionable techniques of organized action. See International Union, U. A. W., A. F. of L., Local 232 v. Wisconsin Employment Relations Board, 336 U. S. 245, 69 S.Ct. 516, 93 L.Ed. 651. Here is simply a case of peaceful picketing against which Congress in the Act has provided the complete remedy. In this context of labor controversy, the legality of peaceful picketing may not be decided on the common law of torts; rather the conflicting interests of the union, the employer, the workers, and the community must be weighed according to the statutory scheme. See Cox, Federalism in the Law of Labor Relations, 67 Harv.L. Rev. 1297, 1323. Since the states in matters of peaceful stranger picketing may not invade the province of the Board, it is clear that the federal courts have no greater power. Garner v. Teamsters, Chauffeurs and Helpers Local Union No. 776 (A. F. L.), supra, 346 U.S. 485, 491, 74 S.Ct. 161.

It may be true that the legal consequences flowing from this picketing depend upon whether plaintiff's operators were employees or independent contractors. But this basic question, which surely is far from frivolous, is one of the type which an administrative agency, set up for the adjustment of these delicate relationships, ought primarily to consider. Otherwise, control by the Board is limited and postponed in point of time. The complaint does not present a case for the adjudication of a federal district court.

Reversed.