A. Irwin TAYLOR, Carl F. Chapman, William Edmiston, James P. Simpson, Glenn C. Smith, and Harry S. Eklof, Appellants,

v.

LOCAL NO. 7, INTERNATIONAL UNION OF JOURNEYMEN HORSESHOERS OF the UNITED STATES AND CANADA (AFL–CIO), an unincorporated association, Raymond P. Benton, John J. Meehan, John H. Bosley and Robert E. Wheeler,

and

International Union of Journeymen Horseshoers of the United States and Canada (AFL–CIO), an unincorporated association, Appellees.

No. 9310.

United States Court of Appeals Fourth Circuit.

Argued April 5, 1965.

Decided Nov. 5, 1965.

Sobeloff and J. Spencer Bell, Circuit Judges, dissented.

H. Raymond Cluster, Baltimore, Md. (Cook & Cluster, Baltimore, Md., on brief), for appellants.

Bernard W. Rubenstein (Jacob J. Edelman and Marshall A. Levin, Baltimore, Md., on brief), for appellees.

Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN and J. SPENCER BELL, Circuit Judges, sitting en banc.

BOREMAN, Circuit Judge:

These two cases were consolidated for disposition below and on this appeal. Plaintiffs are six trainers or owners of

thoroughbred race horses who race their horses at Pimlico, Bowie and Laurel flat tracks in Maryland and elsewhere in the United States and Canada. Three of the plaintiffs are residents of Canada.

The first action was instituted against Local No. 7, International Union of Journeymen Horseshoers of the United States and Canada (AFL–CIO) and certain of its individual members. The second action was instituted against the International Union of Journeymen Horseshoers of the United States and Canada (AFL–CIO). In both complaints the plaintiffs alleged that the defendants were engaged in a group boycott and price fixing in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2, and sections 4 and 16 of the Clayton Act, 15 U.S.C.A. §§ 15 and 26. Plaintiffs sought relief by way of permanent injunction, declaratory judgment and money damages.

In November 1963 the District Court, after taking evidence and after considering briefs and oral argument, entered a final order dismissing the complaints.[1] The court found that the alleged boycott and price fixing were per se violations of the Sherman Act, but held that the defendants were exempt from federal antitrust laws under sections 6 and 20 of the Clayton Act, 15 U.S.C.A. §§ 17 and 29 U.S.C.A. § 52, respectively, and that it lacked jurisdiction to grant the relief requested under provisions of the Norris-LaGuardia Act, 29 U.S.C.A. §§ 101 and 113, as the case involved a "labor dispute." In determining that the cases involved a "labor dispute" within the meaning of the Norris-LaGuardia Act, the court concluded as a matter of law that the horseshoers (hereinafter sometimes referred to as "farriers") who performed services for the plaintiffs were "employees" and not independent contractors.

Plaintiffs contend that the evidence did not support the District Court's conclusion but showed that the farriers were independent contractors and, as such, were not exempt from antitrust laws. Defendants on the other hand argue that the District Court was correct in its findings and conclusions; further, even if the farriers were independent contractors rather than employees, the cases still involve a "labor dispute" within the meaning of section 13 of the Norris-LaGuardia Act, 29 U.S.C.A. § 113. The latter question was not decided by the District Court in view of its determination that the farriers were "employees."

As trainers or owners of race horses the plaintiffs travel the racing circuit, going from track to track. Defendants, as horseshoers of thoroughbred race horses, often follow the same circuit. Consequently, the owners and trainers avail themselves of the services of several members of the defendant union.

The present controversy arose while plaintiffs were racing their horses at Bowie, Maryland. The three Canadian plaintiffs had used a nonunion member to shoe their horses in Canada. When plaintiffs arrived at Bowie, the farriers there refused to shoe any horses for them unless they signed an agreement to use only union members regardless of where the horses raced, either in the United States or Canada. The refusal by Local No. 7 to serve the Canadians was required by the International. The second question as to price fixing affected all the plaintiffs. Local No. 7 charged a minimum fee of $16 at Bowie for shoeing a race horse. This fee was set by the Local and any member who charged less than the minimum was subject to disciplinary action or possible expulsion by the union. The plaintiffs, as a result of the boycott and price fixing, instituted the present actions.

Defendants do not assert here that the boycotting and price fixing were not violations of the Sherman Act. The questions to be resolved by this court are whether there was substantial evidence to support the District Court's determina-

---

1. Taylor v. Local No. 7, Inter. U. of Journeymen Horseshoers, 222 F.Supp. 812 (D.C.Md. 1963).

tion that the farriers were "employees" rather than independent contractors and whether an employer-employee relationship, as distinguished from that of employer-independent contractor, is necessary to constitute a "labor dispute" within the meaning of section 13 of the Norris-LaGuardia Act, 29 U.S.C.A. § 113.

■■■ The usual test employed for determining whether one performing services for another is an independent contractor or an employee is found in the nature and the amount of control reserved by the person for whom the work is done. The rule was clearly enunciated in Singer Manufacturing Co. v. Rahn, 132 U.S. 518, 10 S.Ct. 175, 33 L.Ed. 440 (1889). The Court at page 523, 10 S.Ct. at page 176 stated:

> " * * * [T]he relation of master and servant exists whenever the employer retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished. * * *."

Complete control over the result to be accomplished is not enough to make an independent contractor an employee. As stated in National Labor Relations Board v. Steinberg, 182 F.2d 850, 856–857 (5 Cir. 1950):

> " * * * an employer has a right to exercise such control over an independent contractor as is necessary to secure the performance of the contract according to its terms, in order to accomplish the results contemplated by the parties in making the contract, without thereby creating such contractor an employee."

Even some reservation of control to supervise the manner in which the work is done, or to inspect the work during its performance does not destroy the independent contractor relationship where the contractor is not deprived of his judgment in the execution of his duties. Conasauga River Lumber Company v, Wade, 221 F.2d 312 (6 Cir. 1955), cert. denied 350 U.S. 949, 76 S.Ct. 324, 100 L.Ed. 827. The determination as to whether or not sufficient control has

been retained rests upon the peculiar facts of each case and no one fact is controlling; the "totality of the circumstances must be considered." N. L. R. B. v. A. S. Abell Co., 327 F.2d 1, 5 (4 Cir. 1964).

The District Court recited certain facts upon which it based its conclusions with respect to the relationship between the owners and trainers and the farriers who served them. However, we think it necessary to consider the relevant attendant circumstances in their totality as clearly disclosed by the record. As this court stated in N. L. R. B. v. A. S. Abell Company, supra, 327 F.2d 1, 4 (4 Cir. 1964), a case which arose under the National Labor Relations Act:

> " * * * Thus, the critical distinction between an independent contractor and an employee is found in the nature and amount of control reserved by the person for whom the work is done. The test, however, admits much more readily of statement than of application. Resolution of the question must depend largely upon the peculiar facts of each case. Moreover, no single factor is controlling and *the totality of the circumstances must be considered."* (Emphasis supplied.)

In its opinion (222 F.Supp. 812, at 817–818), the District Court, in considering evidence of the present day relationship between farriers and trainers, deemed it helpful to refer to the original chartering of the defendant International Union in 1874, its growth to peak membership of 2500, the tremendous loss of members as the use of the horse for transportation ceased, the end of the public horseshoeing shop, the growth of racing of thoroughbred horses, the revived demand for farrier services and so on. At page 818 (after pointing out that there has arisen the so-called public trainer who, for a fee, will train and race horses of owners who own a small number of horses) the court below said:

> " * * * As a result, there are at the present time only fifteen to twenty horseshoers employed by pri-

vate stables on a full time salary basis—the remainder, insofar as thoroughbred racing is concerned, perform their services on a piece-work basis for a public trainer for the account of the owners whose horses he is training and racing."

The principal factual grounds relied upon by the court below to support its conclusions are (1) the right of the trainers to control the farriers' working time; (2) the right of the trainers to control each step of the horseshoeing process; (3) the continuing services the farrier is called upon to render between shoeings; and (4) the fact that "the relationship, however denominated, between most trainers or owners and most farriers is a continuing one of indefinite duration and not sporadic and occasional." But we are persuaded from our examination of the testimony and the whole record that the court ignored other factors clearly appearing which are entitled to consideration in determining the employee or independent contractor status of the farriers.

■■ The finding that the trainers control the working time of the farrier is, in our opinion, not supported by the record. The evidence is clear that the farriers do not work regular hours set by the trainers but work at their own convenience. At the start of a race meet, the trainer goes to the track's blacksmith shop (where the farriers gather) and contacts a farrier. The farrier works for more than one trainer as no one owner or trainer has enough horses to require full time services of a farrier. The trainer must seek out a farrier when shoeing services are needed and arrange, usually a day in advance, an appointment based on the farrier's scheduled commitments. The farrier is entirely free to decide how many days he will work in a week and the number of horses he will shoe in a day. The court below pointed to no evidence to the contrary but rested its conclusion of temporal control on the

theory that the farrier is not really in control of his time because "there is economic pressure on him to work since a horseshoer works to support himself and his family, and not simply for his own amusement"; and that in deciding when to work, "a horseshoer is in the position of having to please the owner or trainer if he desires continued engagement, because the owner or trainer who is dissatisfied with the services of a particular farrier can, and does not hesitate, to replace him with somebody else." In this context we feel compelled to reject this line of reasoning. Pressures of economic necessity to work in order to provide for one's family and to accommodate the needs of the person who is paying for the services are applicable to every person engaged in a trade, calling or profession for gain and are not relevant considerations in determining whether one is an employee or an independent contractor. It goes without saying that independent contractors, as well as employees, must work to support themselves and their families and must make themselves available to render services at such times as they are needed.

The court found that the trainers have the right to control "each step of the horseshoeing process." We must assume that in so finding the court meant the actual work of replacing the shoes on the horse, since it is clear that the trainer does not control in any way the *process* of making or altering shoes, the tools used, the price charged, or other such factors related to the "process." As to the limited process of the actual shoeing, a consideration of all the testimony indicates that instances of actual participation or exercise of control by trainers in the manner and means of accomplishing the shoeing, as distinguished from the end result, are limited to a few self-styled experts among the trainers; and that the almost universal practice of trainers is to entrust the actual shoeing of their horses to the expertise of the farriers and

to concern themselves only with the *end result*.[2]

There is no doubt that the trainers told the farriers what they wanted and expected; they even checked during the shoeing process to see that their instructions were being followed. But a typical example of the sort of control exercised by the trainers is found in the testimony of farrier Raymond Benton, a witness for the defense.[3]

■ The continuing services supplied by the farrier between shoeings to which the District Court referred, as testified to by witnesses Miller and Simpson, amount to no more than making minor adjustments as necessary or replacing the shoe if it comes off. In other words, the farrier must stand behind his work just as any other craftsman must if he expects to retain customers, and this is no more characteristic of an employee than an independent contractor. It is clear from the record that the trainer is not entitled to the continuing general services of the farrier between shoeings; if any substantial changes or additions are required, the farrier is contacted, his services are obtained, and he is paid in the usual manner.

2. The distinction between the end result and the ways and means of accomplishment may well be demonstrated by the following: Many men prefer the same barber, returning time after time and at more or less regular intervals, even though the barber may change shops. Some barbers make appointments while others do not. Some are union members while others are not. A customer learns from experience that a certain barber can serve him acceptably and according to instructions. It may be that the customer wants clippers used on the sides of the head and on the back of the neck; another wants his hair trimmed only with scissors; another wants a "crew" cut; one wears his hair long and another short; some want their eyebrows trimmed while others do not. The customer always assumes the right to direct the barber during the course of the hair-cutting operation—to take off here and there or leave portions untouched. The barber provides the tools and equipment and fixes his fees. The customer in each instance is interested in the end result even though directing certain ways and means of accomplishment. The barber strives to please in order to assure the customer's return. Obviously, the amount of retained control and right to direct does not convert the status of the barber from independent contractor to that of employee.

3. "Q. Now, does each trainer retain the right to direct you with respect to how much to cut or the type of shoe to put on?
"A. Yes. You have occasions that you might shoe a horse one day and you might not do it just right, and the trainer will tell you, maybe you took too much off or maybe you didn't take enough off, how about adjusting the foot or something to make it—try to make it the same or whatever he wants."

*   *   *   *   *

"Q. On any of the things you have mentioned, what tools you use or where you place the horse or which way he is facing, do you get specific instructions about that from the trainer or assistant trainer, or do you use your own judgment on that?
"A. A lot of times, they'll tell you that this horse will stand good in the stall, this horse will stand good outside, maybe we'd better take him to another barn or leave him in the stall or turn him around or—the whole time.
"Q. And after you get him standing, what do you do then?
"A. Pull the shoe off, trim the foot.
"Q. Now, do you receive instructions as to how to pull the shoe off?
"A. No.
"Q. And what about trimming the foot?
"A. That's basically what you get back to is some don't like high heels on a horse. They want the heels cut down. Some want a short toe, some like for the toe to grow out longer, at a different angle. Some don't want the frog touched. Some don't want the sole touched.
"Q. Well, now you indicated that those kinds of instructions are given to you by the trainer at the time he decides to use your services. At the beginning, he tells you those kinds of things. I like the toe short or I like it high or low or whatever.

"Now, do you tell me that he repeats that instruction to you every time you come into there and shoe his horse?
"A. Well, if you go back and he happens to see a horse that is not shod to his liking, he'll tell you, I think you have missed this horse, maybe do something else to him, or change him."

Finally, the court below found that the relationship between trainer and farrier is a continuing one of indefinite duration rather than occasional or sporadic. In some instances it is true that a trainer will use the services of the same farrier over an entire racing meet or season, or even a period of years, if the farrier sees fit to be at the same track and to agree to perform the services. However, the fact is that the services are performed only occasionally and as needed. In other instances, particularly in the case of trainers who have only a very small number of horses and who find it difficult to obtain the services of a farrier, the relationship is even much more sporadic. Mr. Simpson, with a large stable of horses and an obvious preference for a continuing relationship, changed farriers on several occasions. Farrier Benton, who did work for Simpson, shod only twenty Simpson horses during portions of nine separate days over a thirty day period. It is true that Benton maintained his own records on each horse and periodically returned to reshoe the horses without specific requests. But this was exceptional and was not the usual custom. Mr. Chapman used all the available farriers in Maryland, not any particular one. In any event, the relationship between farrier and trainer is clearly much less continuous or permanent than that between the publisher and carrier in N. L. R. B. v. A. S. Abell Company, 327 F.2d 1 (4 Cir. 1964), in which this court found this factor not indicative of an employer-employee status in view of the total situation.

■ In its published opinion [4] the District Court quoted 1 Restatement, Agency 2d (1958 Ed.) § 220(2), (a) through (j), wherein are set forth certain matters of fact which, among others, are to be considered in determining whether one acting for another is "a servant [employee] or an independent contractor." Opposed to the four principal factors relied upon by the court below in the instant case to support its finding of employer-employee status are the following factors clearly established by the evidence, some or all of which are considered by the courts, including this court in the Abell case supra, and the Restatement, to be criteria supporting a finding of independent contractor status:

(1) The farrier's income is dependent, at least to some extent, on factors which are without the control of the trainer. In addition to the farrier's sole determination of when, where, how long and for whom he will work, he controls his own income through his complete control of the price of his services and the risk of profit and loss involved. The District Court found that the farriers sell shoes at cost without calculating a profit on resale. This is generally true when a certain type shoe is used but the evidence disclosed the practice of manufacturing various types of steel shoes in volume for later sales to trainers. Error of judgment in the amounts and types of shoes manufactured by the farriers could clearly result in profit or loss and in this respect they run the same risk as any manufacturer. The price they pay for their tools, the type of tools purchased, the cost of printed billheads, the type of car or truck used for travel from one track to another and the cost of maintenance and operation, are all variables which affect income. In addition, the individual farrier decides for himself whether to employ an apprentice and it was shown that employment, at fixed wages, of an apprentice is quite expensive and is of no real advantage to a farrier; consequently, employment of an apprentice means a reduction in net income.

(2) Farriers provide their own tools.

(3) Farriers are highly skilled, and horseshoeing is a distinct occupation or business.

---

4. 222 F.Supp. 812, 821 (n. 4). The District Court did not, however, quote the "Comment on Subsection (2)": "(h) Factors indicating the relation of master and servant," and (i) which states that the custom of the community as to the control ordinarily exercised in a particular occupation is of importance.

(4) Farriers are paid by the job and not by the hour, week or month. "Piece rate" employees, working on an incentive plan, ordinarily receive a minimum guaranty for a specified number of hours worked per week regardless of the number of "pieces" completed; and their hours of work are established and controlled by their employer.

(5) Farriers do not work regular hours or in full time employment with one employer.

(6) Farriers regard themselves as independent contractors. This is indicated by their printed billboards, employment of apprentices, reference in their constitution to trainers as "customers," unilateral price-fixing, and unilateral establishment of work rules, hours of work and bill collection methods.

(7) Trainers regard farriers as independent contractors. They make no deductions for social security or income taxes, and carry no workmen's compensation insurance on the farriers as they do for their grooms. They regard farriers as specialists, similar to veterinarians. They do not keep records of their hours for any purpose.

(8) Farriers decide whether to demand cash payment or extend credit, and they have established a bill collection procedure through their rule that one will not perform services for any trainer who owes money to another farrier.

(9) Some farriers receive retainers from trainers to guarantee first call on the farrier's services. The payment of a "retainer" for this purpose is clearly indicative of an independent contractor status—not an employee status; and the fact that without the payment of a retainer, the trainer has no assurance that the farrier will serve him, certainly negates the idea that the farrier is his employee. If two trainers wish the services of the same farrier at the same time, it is the farrier who decides for whom he will work.

(10) The "custom of the community" supports the conclusion that the farriers are independent contractors. Analogies to the relationship between the trainer and the farrier are numerous and the court will take judicial notice of the fact that no employer-employee relationship is created in these analogous situations. The individual painter, plumber, roofer, electrician, dressmaker, television repairman and a host of others who come to one's home to perform services, who are told when they may come, what they are to do, what kind of fixture to install, what color and brand of paint to use, whose work is subject to on-the-spot suggestion, criticism and disapproval, and with whom a more-or-less continuing relationship is often maintained, do not become the employees of the householders who contract with them to perform these various services at which they are skilled. They are independent businessmen in the eyes of the community, and so too, we conclude, are the farriers with their particular skills, individual business billheads and freedom to work when and where and at the price they please.

It is most unlikely in any relationship that *all* of the criteria listed as relevant by the courts and Restatement will point in one direction or the other; in each case a balancing and judging of the various factors in the light of the total situation must be accomplished in order to reach a reasonable result. A consideration of the total picture here forces us to the conclusion that the criteria pointing to independent contractor status of the farriers overwhelmingly outweigh, both qualitatively and quantitatively, those criteria which point to employee status. If there is one single aspect of the evidence which points up most dramatically how different from employees are these farriers in relation to the trainers, it is found in the facts that the trainers do have employees, the grooms, and some farriers do work as salaried employees for the tracks. There is a vast dissimilarity between the status of a groom or track-employed farrier and the status of a farrier performing the services herein described for a trainer or owner.

We are not unmindful of the rule that erroneous conclusions of law may always be set aside while findings of fact, to be rejected on appeal, must be "clearly erroneous" and that a finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been committed. Smith v. United States, 336 F.2d 165, 168 (4 Cir. 1964). We have such a firm conviction here with reference to the findings upon which the court relied so heavily. In N. L. R. B. v. A. S. Abell Company,[5] this court held that common law tests are to be used to distinguish between "employee" and "independent contractor." Although, as we have pointed out, that case arose under the National Labor Relations Act, we perceive no valid reason why the same tests are not applicable here. We are persuaded that the court erred in concluding, as a matter of law, that the defending farriers are "employees."

We find no case decided in the courts of the United States in which the relationship such as here existing between farriers and trainers has been considered. The District Court, recognizing that rarely are any two cases alike on their facts, discussed certain decisions of the Supreme Court of the United States and undertook to follow the principles therein determined to be applicable on the recited facts. We shall not do more than advert to the discussion below since we do not find it persuasive in light of the facts and circumstances of the instant case, considered in totality.

The lower court considered but declined to follow a decision of the Ontario Labour Relations Board in International Union of Journeymen Horseshoers, Local No. 20, and Merrill, et al.[6] It appears that Keyruze, president of Local No. 20 of the International, and Smith, first vice president of the International and a member of Local No. 20, filed complaints with the Ontario Labour Relations Board charging that certain owners and trainers in Canada had discriminated against them (after they had instigated the boycott against the Canadian plaintiffs in Maryland) in violation of section 65 of the Ontario Labour Relations Act. The proceeding turned on whether the complainants were independent contractors and, as such, unable to invoke the protective provisions of the Canadian Act. They were horseshoers whose relationship with the owners and trainers were substantially the same as the relationship between the farriers and trainers in the instant case. The Board said:

"  *  *  *  we are constrained to find that James Smith and Samuel Keyruze are independent contractors. While the services rendered by these blacksmiths are customarily restricted to persons engaged in horse racing, and not infrequently for extended periods to the same persons, their services are with respect to, and result entirely from independent and individual contracts. Their services are not rendered as employees under a contract of employment but as independent craftsmen who at all times remain their own masters as to when, how and for whom they will work and for how much."

The term "employee" was not defined in the Act there involved and the Board looked to the general or common law, not only of Canada but of the United States as indicated by certain references contained in its opinion. Of course, that decision is not binding in any way upon this court but it is reassuring since our conclusions are not in conflict therewith. If we were to hold that the farriers are employees, horseshoers, when performing the same services in the same way for the same people, would be independent contractors in Canada and "employees" in the United States—an incongruent result, to say the least.

---

5.  327 F.2d 1, at page 4.

6.  Cited in appellants' brief as James Smith and Samuel Keyruze, May 1963, O.L.R.B. Monthly Reports, 112.

We next consider the contention of the defendants that even though the farriers are not "employees" of the trainers, they cannot be enjoined from engaging in their activities of boycotting and price-fixing because this case involves or grows out of a "labor dispute" within the meaning of the Norris-LaGuardia Act of 1932. As we earlier noted, the District Court concluded that it was unnecessary to decide this point.

Section 1 of the Norris-LaGuardia Act, 29 U.S.C.A. § 101, deprives courts of the United States of jurisdiction to issue an injunction "in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter."

Section 13 of the Norris-LaGuardia Act, 29 U.S.C.A. § 113, defines terms and words used in 29 U.S.C.A. Chapter 6.[7]

Difficult questions as to the application of the antitrust laws to the activities of labor unions and the accommodation of the apparently conflicting federal policies in the area of restraint of trade and labor-management relations in the Sherman, Clayton and Norris-LaGuardia Acts have been presented to the courts over the years. The history of the application of the Sherman Act to union activities and of the subsequent passage and judicial interpretation of the Clayton and Norris-LaGuardia Acts is well summarized by Mr. Justice Black in Allen Bradley Co. v. Local Union, etc., 325 U.S. 797, 65 S.Ct 1533, 89 L.Ed. 1939 (1945).

The parties here agree, and the court below correctly stated, that since the decision in United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941), it is well settled that provisions of the Sherman, Clayton and Norris-LaGuardia Acts must be considered together in determining the scope of the exemption of union activities from the antitrust provisions; and, in the light of such consideration, the test to be applied in determining whether such activities are exempt is whether they present a case which can be said to involve or grow out of a "labor dispute."

Section 20 of the Clayton Act (29 U.S. C.A. § 52) provides that no restraining order or injunction shall be granted by any court of the United States in any case between certain named classes of parties involving, or growing out of, a dispute concerning terms or conditions of *employment* but it does not define "a dispute concerning terms or conditions of employment." The purpose of Con-

---

7. Portions of 29 U.S.C.A. § 113 are set out below.

"§ 113. Definitions of terms and words used in this Chapter.

"When used in this chapter, and for the purposes of this chapter—

"(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a 'labor dispute' (as defined in this section) of 'persons participating or interested' therein (as defined in this section).

"(b) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation.

"(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, *regardless of whether or not the disputants stand in the proximate relation of employer and employee.*" (Emphasis added.)

gress in enacting the Norris-LaGuardia Act was to obviate the results of judicial construction which had been given the Clayton Act, including section 20 thereof, to express the public policy of the United States and to define the congressional conception of a "labor dispute" in terms that "no longer leave room for doubt." [8] "The Norris-LaGuardia Act reasserted the original purpose of the Clayton Act by infusing into it the immunized trade union activities as redefined by the later Act." [9]

Now, however, in considering the sharply conflicting contentions of the parties here with respect to the meaning of "labor dispute" as defined in section 13(c) of the Norris-LaGuardia Act (chapter 29 U.S.C.A. § 113(c)), which definition was so optimistically depictured in 1941 as no longer leaving "room for doubt," we find that we must still look for judicial guidance in striving to properly interpret and apply section 113 to the facts of this case.

Our attention is directed to the case of Columbia River Packers Ass'n v. Hinton, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750 (1942). There the Pacific Coast Fishermans' Union, a CIO affiliate, had a provision in its constitution and by-laws that union members should not "deliver catches [of fish] outside of Union agreements" and union fishermen refused to sell fish to buyers who did not agree to purchase fish exclusively from union members at prices established by the union. Upon the refusal of Columbia River Packers Association, a buyer, to sign such an agreement, the union induced its members to refrain from selling fish to the Association. In defending a charge of antitrust violations, the union claimed exemption under the Clayton and Norris-LaGuardia Acts. The Supreme Court, denying the exemption, noted that the controversy was between businessmen over a contract concerning sales of fish and held that there was no labor dispute because there was no employer-employee relationship affected by or involved in the controversy. The Supreme Court there reversed the Ninth Circuit Court of Appeals [10] which had held that the District Court erred in granting an injunction since involved was a controversy concerning terms or conditions of employment included in the term "labor dispute." The Court of Appeals (117 F.2d 310, at 313), after reciting dictionary definitions of the word "employment," said:

"It can be seen that if the word 'employment' is used in several of the senses above mentioned, it is broad enough to cover the situation disclosed here. 'The words of a statute are to be read in their natural and ordinary sense, giving them a meaning to their full extent and capacity, unless some strong reason to the contrary appears'. * * * We are unable to find any indication that Congress gave the word a restricted meaning."

The Supreme Court, 315 U.S. 143, at 146–147, 62 S.Ct. 520, 522, in reversing the Court of Appeals, stated:

"We recognize that by the terms of the statute there may be a 'labor dispute' where the disputants do not stand in the proximate relation of employer and employee. But the statutory classification, however broad, of parties and circumstances to which a 'labor dispute' may relate does not expand the application of the Act to include controversies upon which the employer-employee relationship has no bearing. Our decisions in New Negro Alliance v. [Sanitary] Grocery Co., 303 U.S. 552 [304 U.S. 542, 58 S.Ct. 703, 82 L.Ed. 1012] and Milk Wagon Drivers' Union v. Lake Valley [Farm Products, Inc.], 311 U.S. 91 [61 S.Ct. 122, 85 L.Ed. 63], give no support to the respondents' contrary contention, for in both

8. United States v. Hutcheson, 312 U.S. 219, 234, 61 S.Ct. 463, 467.

9. Id. at 236, 61 S.Ct. at 468.

10. Hinton v. Columbia River Packers Ass'n, 117 F.2d 310 (1941).

cases *the employer-employee relationship was the matrix of the controversy.*" (Emphasis added.)

"The controversy here is altogether between fish sellers and fish buyers. The sellers are not employees of the petitioners or of any other employer nor do they seek to be. On the contrary, their desire is to continue to operate as independent businessmen, free from such controls as an employer might exercise. That some of the fishermen have a small number of employees of their own, who are also members of the Union, does not alter the situation. For the dispute here, relating solely to the sale of fish, does not place in controversy the wages or hours or other terms and conditions of employment of these employees."

In New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012 (1938), to which the Supreme Court adverted in its decision in the Columbia River case, an association of Negroes and its officers sought to have Retail Grocery Store Company adopt a policy of employing Negro clerks in certain of its stores. The Alliance undertook to picket to force the Grocery Company to hire Negroes, to make them *employees.* The Court held that the members of the Negro organization were "persons interested" in a labor dispute between them and the company within the meaning of the Norris-LaGuardia Act, notwithstanding the absence of employer-employee relationship and notwithstanding the fact that the organization and its officers were not engaged in the same business as the company or in a competing business. The Supreme Court noted that the Court of Appeals thought that the dispute was not a labor dispute within the meaning of the Act because it did not involve terms and conditions of employment such as wages, hours, unionization, or betterment of working conditions, and that the trial court had jurisdiction to issue an injunction. However, the employer-employee relationship was found to be the matrix of the controversy. At 303 U.S. 559 and 560, 58 S.Ct. at 706, the Court stated:

"* * * We think the conclusion that the dispute was not a labor dispute within the meaning of the act, because it did not involve terms and conditions of employment in the sense of wages, hours, unionization or betterment of working conditions is erroneous."

The second case mentioned by the Supreme Court in the above quotation from the Columbia River decision is Milk Drivers' Union v. Lake Valley Co., 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63 (1940). There a union of milk wagon drivers, employed by local dairies in delivering milk from door to door to retail customers, picketed a number of retail stores which sold, at cut prices on the cash-and-carry plan, milk bought at wholesale from individuals called "vendors," who delivered it by their own trucks from supplies bought from other dairies under arrangement whereby their supplying dairies accepted the return of unsold milk at full purchase price. This "vendor" system had made inroads on the business of union dairies and affected unfavorably the wages and employment of members of the drivers' union. Claiming unfair competition, the drivers' union sought, through picketing, to compel the "vendors" to join it for the purpose of improving their wages and working conditions. Two of the cut-price dairies, an industrial union (organized by their employees, including "vendors") and an out-of-state cooperative association supplying milk joined in a suit charging the drivers' union and its officers with violation of the Sherman Act and seeking an injunction against picketing and acts of violence. There was evidence to show that the plaintiff industrial union had a contract with each of the plaintiff dairies providing that the term "employee" as used in such contract means all wholesale and retail route salesmen or drivers, their helpers and assistants, all milk distributors referred to as "vendors" and all persons employed in the sale and distribution of the employer's products; and

each contract provided for a closed shop giving to plaintiff union the exclusive right to represent all the employees, including vendors, for purposes of negotiating on all questions of wages, hours and conditions of employment that should prevail in the employer's business. The Court held that the case arose out of and involved a "labor dispute"; that all of the parties had direct or indirect interests in the production, processing, sale and distribution of milk; that the Norris-LaGuardia Act applies to "labor disputes" between persons who are engaged in the same industry, trade, craft or occupation, or have direct or indirect interests therein. The Court reached the conclusion that the relationship of employer-employee was the "matrix" of the controversy. (See Columbia River Co. v. Hinton, 315 U.S. 143, 147, 62 S.Ct. 520, 86 L.Ed. 750, for the Court's explicit declaration of the basis of its holding in Milk Wagon Drivers' Union v. Lake Valley Co., supra.)

In American Medical Association v. United States, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943), the A.M.A. and the Medical Society of the District of Columbia (hereinafter called the accused) were convicted of conspiring to violate the Sherman Act. A nonprofit corporation, Group Health, had been organized by government employees to provide medical and hospital care on a prepayment plan and employed full-time physicians on a salary basis. The accused, certain individuals some of whom were their own officers or employees, and some of their members who were practicing physicians, sought, among other things, to coerce other of accused's physician members from accepting employment under Group Health, to prevent accused's members from consulting with Group Health's doctors who might desire consultation, and to prevent hospitals in and about Washington from affording facilities for the care of patients of Group Health's physicians. The Court assumed that doctors who had contracts with Group Health were employees of that corporation. It was argued that there was a dispute concerning terms and conditions of the employment of doctors in which the accused were interested; that when a committee of the D. C. Medical Society first conferred with representatives of Group Health, a controversy arose, the matrix of which was the terms and conditions of employment by Group Health of members of the District Society to perform Group Health's medical work; that Group Health rejected an offered basis of employment of members of the District Society and insisted upon dictating the terms and conditions of such employment and method of payment of compensation. The Court held that the accused did not represent employees, either present or prospective; that their purpose was to prevent anyone from taking employment under Group Health; the accused "were not an association of employees in any proper sense of the term. *They were an association of individual practitioners each exercising his calling as an independent unit.* [Emphasis supplied.] These independent physicians, and the two * * * associations which represent them, were interested solely in preventing the operation of a business conducted in corporate form by Group Health. In this aspect the case is very like Columbia River Packers Assns. v. Hinton, 315 U.S. 143 [62 S.Ct. 520, 86 L.Ed. 750]." (317 U.S. at 536, 63 S.Ct. at 332.) The Court concluded that no labor dispute was involved and the activities of the accused were not protected by the Clayton and Norris-LaGuardia Acts.

■ From its study of the Clayton and Norris-LaGuardia Acts and the interpretation of those acts by the courts, the trial court concluded, and we agree, that boycotting and price-fixing activities, such as those engaged in by the defendants in the instant case, would be exempt from operation of the antitrust laws (1) if the parties to a dispute stand in the relationship of employer and employee and dispute some aspect of that relationship, or (2) if the employer-employee relationship of others is the crux of the dispute between the parties.

We have determined that the disputants here, the farriers (and their unions) and the complaining owners and trainers do not stand in the proximate relation of employees and employers. But the defendants contend that, even if the farriers are not employees of the plaintiffs and other similar owners and trainers, their activities with respect to the plaintiffs involve a labor dispute and are exempt from antitrust restrictions since they work at times as common law employees of the race tracks, other horseshoer members of the union work at times as employees of rodeos and annual trail rides and, since they are all members of the same union and engaged in the same industry, trade, craft or occupation, the defendants' activities with relation to the owners and trainers in some way involve or affect the employer-employee relationship between horseshoers, on the one hand, and race tracks, rodeos and trail rides on the other. We think this contention is without merit and must be summarily rejected.

There is no evidence in the record that the boycotting and price-fixing activities of the defendant unions were undertaken in aid of or in connection with the wages, hours, working conditions or any other interest of horseshoers performing services for race tracks, rodeos or any persons other than trainers and owners of race horses who are in every way similar to the plaintiffs here. There is no evidence to even suggest that the boycotting of the Canadian trainers for the purpose of requiring them to use the services of union members in Canada had, or was intended to have, any effect on horseshoers employed by race tracks or other employers in Canada or elsewhere. Here the horseshoers are not attempting to force the owners and trainers to use any of them as employees, nor are the unions attempting to organize any employees of the trainers or owners. The defendants are seeking to coerce the plaintiffs into using, exclusively, the services of the union members who are independent contractors, not employees.

It is not disputed that the employer-employee relationship exists between the management of race tracks and rodeos and some union members but no controversy exists concerning that relationship. An employer-employee dispute is nowhere involved. The only interests sought to be advanced by the activities of these defendants are the interests of those independent horseshoers who render services to trainers and owners for a certain fee, unilaterally fixed, per horse. They are independent businessmen, specialists in their line, who have banded together and who act in concert for their mutual benefit and improvement. We fail to discover the existence of any employer-employee relationship which is the "matrix" of this controversy or any condition which, under the provisions of either the Clayton Act or the Norris-LaGuardia Act, would protect the activities of the defendants.

It follows from what we have said that the District Court erred in determining that it lacked jurisdiction to grant injunctive relief and in dismissing the complaints. The cases will, therefore, be remanded for appropriate proceedings below.

Reversed and remanded.

SOBELOFF, Circuit Judge, with whom J. SPENCER BELL, Circuit Judge, joins (dissenting):

These appeals had their origin in a dispute between the International Union of Journeymen Horseshoers of the United States and Canada (AFL-CIO) and nine owners and trainers of thoroughbred race horses.

One aspect of the controversy arose when three of the Canadian owners and trainers, while in Canada, used a Canadian nonunion farrier to shoe their horses. Later, when they brought their horses to a racing meet at Bowie, Maryland, the International Union required its Local No. 7 to refuse service to the Canadians unless they would sign an agreement to use only union members, both in the United States and Canada. The other aspect of the case affecting all of the

plaintiff owners and trainers sprang from the local union's setting of a minimum charge at Bowie of $16 for the shoeing of each race horse. The local enforced this policy by threatening to discipline or expel any union member who charged less than this minimum price.

The owners and trainers brought two actions in the District Court—one against the International Union, the other against the local. In both actions they alleged that the defendants were engaged in a group boycott and price fixing in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1 & 2, and sections 4 and 16 of the Clayton Act, 15 U.S.C.A. §§ 15 & 26, and sought a permanent injunction, declaratory judgment and money damages.

The unions' defense was that this was a "labor dispute" as defined by section 13 of the Norris-LaGuardia Act, 29 U.S.C.A. § 113, construed in light of section 20 of the Clayton Act, 29 U.S.C.A. § 52, and that sections 4 and 7 of the Norris-LaGuardia Act, 29 U.S.C.A. §§ 104 & 107, therefore deprived the court of jurisdiction to issue the requested injunction. From this it would follow, under the Supreme Court's decision in United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941), that the unions' conduct was not violative of the antitrust laws, and hence plaintiffs were not entitled to any of the remedies sought.

The District Court concluded that the horseshoers are "employees" of the owners and trainers, and that the case thus involved a "labor dispute" within the definition of section 13(a) of the Norris-LaGuardia Act, 29 U.S.C.A. § 113(a). The court therefore found it unnecessary to deal with the unions' further argument that, whether the men are employees or not, this is in any event a "labor dispute" within the meaning of section 13(c) of the Norris-LaGuardia Act, 29 U.S.C.A. § 113(c), and dismissed both complaints.

The District Court's finding that the horseshoers are employees has ample support in the record and is not clearly erroneous. For the reasons fully set forth in the opinion of District Judge Winter, and which need not be repeated at length, I would affirm. See Taylor v. Local No. 7, International Union of Journeymen Horseshoers, 222 F.Supp. 812 (D.Md.1963).

Moreover, even if appellants are deemed to be independent contractors, the court is not at liberty to disregard the Norris-LaGuardia Act. The Act defines "labor dispute" in the following manner:

"The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, *regardless of whether or not the disputants stand in the proximate relation of employer and employee.*" 29 U.S.C.A. § 113(c). (Emphasis added.)

Fairly construed, the statutory definition is broad enough to cover the situation disclosed here—an effort by the farriers to compel the owners and trainers to use only union members, and to get $16 for shoeing each race horse. As I read Columbia River Packers Ass'n, Inc. v. Hinton, 315 U.S. 143, 62 S.Ct. 520 (1942), reversing Hinton v. Columbia River Packers Ass'n, Inc., 117 F.2d 310 (9th Cir. 1941), the Supreme Court did not disapprove a similar interpretation of the statute by the Ninth Circuit, but simply held that "[t]he controversy here is altogether between fish sellers and fish buyers * * * relating solely to the sale of fish" and not relating to "terms and conditions of employment * * *." The value of the horseshoe included in the $16 shoeing charge is not sufficient, in my opinion, to bring the controversy within Columbia River.

The dispute between the farriers and the owners concerns the reward paid the farriers for their labor. The refusal to handle the Canadians' horses grows out of the latter's use of labor which undercut wage standards the union deemed fair. The defendants' conduct involves nothing more than the withholding of their labor in order to coerce the owners

to have all work performed under minimum union standards. Such a withholding of labor does not violate the antitrust laws. See Hunt v. Crumboch, 325 U.S. 821, 65 S.Ct. 1545, 89 L.Ed. 1954 (1945). It falls rather within the definition of a labor dispute prescribed in the Norris-LaGuardia Act, even in the absence of any employer-employee relationship either between the parties directly or with anyone else. Aetna Freight Lines, Inc. v. Clayton, 228 F.2d 384 (2d Cir. 1955), cert. denied, 351 U.S. 950, 76 S.Ct. 846, 100 L.Ed. 1474 (1956).

In Aetna Freight the Teamsters demanded that the trucking company enter into a collective bargaining agreement with it as the representative of the owner-operators of the company's leased trucks. When the company refused, the Teamsters picketed the premises of the company and its customers. In reversing the lower court's order enjoining the picketing, the court, through Judge Clark, said that the union was attempting to enforce uniform terms for drivers and helpers in the steel hauling industry in the Buffalo area.

> "Neither the fact that persons working for Aetna may be independent contractors nor the fact that Aetna's dispute was with an organization of persons not its employees would be sufficient to remove this controversy from the broad definition of § 13 [of the Norris-LaGuardia Act]. * * * [T]he efforts of the Union to secure more uniform observance throughout the industry of the working conditions enjoyed by its members was a labor matter; and this controversy arising directly from such effort was a 'labor dispute' within the meaning of the Act." 228 F.2d at 387.

The term "labor dispute" can in some circumstances encompass disputes between suppliers of labor and purchasers of labor, regardless of the label attached to their relationship.

My conclusion therefore is that the District Court should be affirmed in its holding that an employer-employee relationship exists, and I reach the same result apart from the question of the existence of such relationship because the Norris-LaGuardia Act denies a federal court jurisdiction to issue an injunction in these circumstances.